*Decision will be entered under Rule 50.*

---

ELI D. GOODSTEIN AND MOLLIE L. GOODSTEIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61466. Filed August 28, 1958.

*John P. Allison, Esq.,* and *Sandow Holman, Esq.,* for the petitioners.

*John M. Doukas, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the calendar years 1952 and 1953 in the respective amounts of $29,118.51 and $126,586.96. The petitioners allege that the respondent erred in disallowing deductions claimed for interest paid in those years in the respective amounts of $50,000 and $170,511.82, in connection with the purchase of United States Treasury notes, the interest on which is fully taxable. Alternatively, they allege that the respondent erred in failing to allow as a loss deduction for 1952 an amount of $14,722.02 paid in connection with the acquisition of the Treasury notes and in failing to exclude from taxable income of the year 1953 an amount of $120,787.29 included by them as interest on Treasury notes.

The respondent, by amendment to his answer, raises a separate issue by alleging that he erred in accepting the petitioners' treatment of gain on the redemption of certain debentures in 1952 as long-term

---

[4] Supplement to Regulations 111, sec. 29.294–1 (b) (3) (A), p. 438.

capital gain. He now seeks to treat the gain realized on the redemption as ordinary income, and claims an increased deficiency.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioners are husband and wife who reside in Fitchburg, Massachusetts. They filed joint income tax returns on the cash method for the calendar years 1952 and 1953 with the district director of internal revenue at Boston, Massachusetts. The husband, Eli D. Goodstein, will herein be called the petitioner. For many years he has been treasurer of a lock company with offices at Fitchburg. He is an accountant by profession. He was not a dealer in securities, but he had purchased and sold Government securities prior to 1952.

### *The Interest Issue.*

In October 1952, the petitioner first met M. Eli Livingstone who was engaged as sole proprietor in business in Boston as a broker and dealer in securities, operating under the name of Livingstone & Company, hereinafter called Livingstone.

Eli Livingstone informed the petitioner that United States Treasury 1⅜ per cent notes, maturing on March 15, 1954, were then selling below par, and that he could arrange for the financing of the purchase of such notes upon a small downpayment by the purchaser. These Treasury notes carried interest coupons which matured every 6 months, in March and September, and such interest was not exempt from Federal income tax. They discussed the amount of notes to be purchased, the amount of the downpayment, and the income tax consequences of such a transaction.

Thereafter the petitioner entered into a transaction, the detailed steps of which were *in the form* as hereinafter described. All the steps, except as noted, occurred on October 27, 1952.

The petitioner gave Livingstone an order to buy for him $10,000,-000 face amount of the 1⅜ Treasury notes maturing March 15, 1954, and gave to Livingstone his check for $15,000, bearing the notation "To apply purchase U. S. Treasury 1⅜%." Livingstone, as agent, placed an order with C. J. Devine & Co. (herein called Devine), bond dealers for the purchase from that company of $10,000,000 of the Treasury notes. Livingstone issued to Devine a confirmation slip showing the purchase by it, as agent, from Devine of $10,000,000 of the Treasury notes. Livingstone also issued to the petitioner a confirmation slip showing a purchase, as petitioner's agent, of that amount of the Treasury notes. Both confirmation slips showed the price as 99⁴⁵/₃₂, which amounted to a principal sum of $9,912,500, plus

accrued interest on the Treasury notes in the amount of $16,712.71, making a total purchase price of $9,929,212.71. Neither showed any commission charged. Devine, by letter dated October 29, addressed to Livingstone, confirmed the sale to Livingstone of the $10,000,000 of Treasury notes for the account of the petitioner, stated that the notes had been delivered to the Guaranty Trust Company, acknowledged payment, and set forth the serial numbers of the notes.[1]

The petitioner executed and delivered to Seaboard Investment Corp., hereinafter more fully described and referred to as Seaboard, his promissory note in the sum of $9,914,212.71, payable on March 15, 1954, with interest at the rate of 2⅜ per cent per annum. The note recited that the petitioner had deposited with Seaboard as collateral the Treasury notes in the amount of $10,000,000. It was provided that all payments received by the obligee directly from or indirectly for the account of the petitioner should be applied first to the payment of interest and any balance to principal, as the petitioner might elect. The note permitted prepayment upon the payment of interest at the rate of ¼ of 1 per cent per annum from date of prepayment to maturity. It contained the following provisions:

The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder.

The petitioner addressed a letter to Livingstone directing that the Treasury notes be delivered to Seaboard against payment by that company of $9,914,212.71. He also addressed a letter to Seaboard directing that company to receive the Treasury notes from Livingstone against payment to Livingstone of $9,914,212.71, "which is the proceeds of my loan with you." Actually neither the petitioner nor Livingstone nor Seaboard obtained physical possession of the Treasury notes. Instead, they were delivered by Devine to Guaranty Trust Company of New York, pursuant to directions in a letter from Livingstone to Devine that they be delivered for Livingstone's account as agent for the petitioner. On the same date Livingstone, by letter, instructed Guaranty Trust Co. to receive the Treasury notes from Devine, account of the petitioner, against payment to Devine of $9,929,212.71, and instructed that its (Livingstone's) account be charged in that amount.

---

[1] The serial numbers of the notes and the denominations were as follows:
3727, 3390, 3707–10 for $1,000,000 each ; 30717–20, 38146, 38152, 14776, 12520, 12519, 40137–41, 14315, 40014, 39002, 18937–38, 17976–77, 40113, 40112, 40107–11, 40116–20, 30647–49, 13534, 38985, 26159, 26160 for $100,000 each.

The function of the Guaranty Trust Company in the transaction was to clear securities (receive and deliver securities), according to instructions of Livingstone, who had an account with the bank for that purpose. For its services Guaranty Trust Company received a fee. The Treasury notes were received from Devine by Guaranty Trust Company, which duly charged Livingstone's account on its books with the sum of $9,929,212.71 and credited Devine's account with the same amount.

On the same date, October 27, 1952, by another letter to Guaranty Trust Company, Livingstone instructed Guaranty Trust Company to deliver to Devine, from its (Livingstone's) account, the $10,000,000 face amount of Treasury notes against payment of $9,927,650.21. In accordance with these instructions the same Treasury notes were re-delivered on the same day by Guaranty Trust Company to Devine. Devine made payment by its check on the Guaranty Trust Company, certification of which was based upon the amount of the credit to Devine's account above referred to which was made when it delivered the Treasury notes earlier in the day. On the same date Livingstone issued a confirmation slip to Seaboard stating that as agent for Seaboard it had sold for Seaboard's account $10,000,000 face amount of Treasury notes at 99%64 for a total principal price of $9,910,037.50, plus interest in the amount of $16,712.71, less commission in the amount of $12,500, resulting in a net selling price of $9,915,150.21.[2] The petitioner did not give an order for such sale and was not aware of it at that time.

The books of Seaboard contain entries under date of October 27, 1952, recording a note receivable from the petitioner in the amount of $9,914,212.71 and crediting "Accounts Receivable—L. & Co." in the same amount "To record liability to L. & Co. for bonds delivered to Guaranty Trust Co."

Between October 1952 and May 1953 the petitioner issued his checks to Seaboard on the dates and in the amounts noted below. Each check bore a notation that it was in part payment of interest and each was accompanied by a letter of transmittal in which the petitioner stated that the check was in part payment of interest on the note of October 27, 1952. Over the same period the petitioner received from Seaboard payments, apparently by check, in the amounts set forth below and gave his promissory notes therefor to Seaboard. The dates of payments by Seaboard to the petitioner are those indicated by the records of Seaboard.

---

[2] The proper figure would appear to be $9,914,250.21. The error is not explained.

| Checks of petitioner | | | Payments received by petitioner from Seaboard | |
| --- | --- | --- | --- | --- |
| Date | Amount | Date cashed | Date | Amount |
| Oct. 30, 1952 | $40,000.00 | Nov. 10, 1952 | Oct. 14, 1952 | $40,000.00 |
| Dec. 12, 1952 | 10,000.00 | Dec. 17, 1952 | Dec. 18, 1952 | 10,000.00 |
| Jan. 2, 1953 | 10,000.00 | Jan. 7, 1953 | Jan. 5, 1953 | 10,000.00 |
| Jan. 19, 1953 | 10,000.00 | Jan. 23, 1953 | Jan. 21, 1953 | 10,000.00 |
| Jan. 28, 1953 | 11,011.82 | Feb. 4, 1953 | Jan. 30, 1953 | 11,011.82 |
| Feb. 9, 1953 | 10,000.00 | Feb. 12, 1953 | Feb. 10, 1953 | 10,000.00 |
| Feb. 19, 1953 | 10,000.00 | Feb. 26, 1953 | Mar. 4, 1953 | 10,000.00 |
| Apr. 21, 1953 | 10,000.00 | Apr. 23, 1953 | Apr. 22, 1953 | 10,000.00 |
| May 7, 1953 | 10,000.00 | May 13, 1953 | May 8, 1953 | 10,000.00 |
| Total | 121,011.82 | | | 121,011.82 |

On the books of Seaboard the above-listed payments by the petitioner were currently recorded as cash received representing interest income received from the petitioner. The amounts above set forth as having been paid by Seaboard to the petitioner were recorded as cash disbursements for loans to the petitioner represented by notes.

On June 5, 1953, Seaboard issued to petitioner a check for $38,000. This was recorded on its books as a refund of interest, with a corresponding reduction of interest income. Its books show on June 9, 1953, the receipt of an equal amount from the petitioner, which was recorded as a reduction of loans owing from the petitioner.

The books of Seaboard also reflect the receipt on January 18, 1954, of cash from the petitioner in the amount of $78,101.77, which was recorded as interest income. Such books reflect the payment by Seaboard to the petitioner on January 20, 1954, of an amount of $78,000, which was recorded as a loan to him represented by note.

The amount of interest coupons which would have matured in the calendar year 1953 on $10,000,000 face amount of the Treasury notes would be $137,500. The books of Seaboard do not record any actual receipt in 1953 of interest on Treasury notes on behalf of the petitioner. Nor do such books contain any entry in 1953 applying any coupon interest to any interest obligation of the petitioner to Seaboard.

On January 18, 1954, the petitioner addressed a letter to Seaboard stating:

You are hereby advised that I have this day assigned all my equity in the $10,000,000 U. S. Treasury 1⅜% Notes of 3/15/54, which you hold for my account as collateral against my loan with you, to the MORRIS FALK FOUNDATION.

On January 19, 1954, the Morris Falk Foundation, by Julian J. Meyer, trustee, addressed a letter to Livingstone stating:

Please sell for our account for cash, $10,000,000 U. S. Treasury 1⅜% Notes of 3/15/54, and receive the same from the Seaboard Investment Corp., against payment to them of the amount of their lien. Kindly transmit the difference to us.

On January 19, 1954, Livingstone issued a confirmation slip to Morris Falk Foundation stating that as agent for the Foundation it

had sold $10,000,000 of United States Treasury 1⅜ per cent notes of March 15, 1954, at 100%₃₂, resulting in a principal sales amount of $10,028,125, which with interest in the amount of $47,859.12, made a total selling price of $10,075,984.12. The confirmation slip does not show any commission charged. The total amount was entered as of the same date on Seaboard's books as a debit to "Acc. Rec. L & Co." Credit entries totaling the same amount were made consisting of $17,092.55 to interest income, $10,058,511.82 to notes receivable, and $379.75 to loans receivable. The explanation for the foregoing entries was "To record delivery of bonds from L. & Co. to cover short sale and redelivery for acct of Eli Goodstein in cancellation of note & interest due." An entry dated January 20 reflects a disbursement by check of $379.75 to "M. Falk Foundation—a/c Goodstein." The petitioner's note of October 27, 1952, was marked "Paid & Cancelled Jan. 19, 1954" by Harry N. Cushing, treasurer.

On July 14, 1955, the petitioners executed a sworn "Amended Protest" and submitted it to the respondent. It contained the following statement:

On January 18, 1954 taxpayer Eli D. Goodstein directed the Lender [Seaboard] to sell his bonds and credit his account with the proceeds. The bonds were sold on that date at 100%₃₂nd for $10,028,125.00, plus accrued interest of $47,479.28. or a total sales price of $10,075,604.28. The proceeds exceeded the purchase price by over $147,000. The interest paid to the Lender [Seaboard], however, exceeded the coupon interest on the bonds by about $161,000, so that the transaction resulted in a small financial loss. In view of the large number of bonds involved, however, it is obvious that with but a small additional increase in the market price, profit could have been realized.

Seaboard was a Massachusetts corporation, incorporated in 1952, and had its office in Boston. Its president was Samuel Livingstone, brother of M. Eli Livingstone. It filed returns on the basis of a fiscal year ended June 30. Its principal business activity was described in the returns as "Finance." Its balance sheet showed no assets or liabilities at July 1, 1952. The balance sheets contained in the returns show assets and liabilities at the close of its fiscal years ended June 30, 1953 and 1954, as follows:

| ASSETS | | June 30, 1953 | June 30, 1954 |
|---|---|---|---|
| Cash | | $741. 81 | $342. 06 |
| Notes and accounts receivable | $162, 688, 123. 59 | | |
| Less: Reserve for bad debts | 1, 579, 968. 75 | | |
| | | 161, 108, 154. 84 | |
| Other assets | | 573, 672. 70 | 50. 00 |
| Total assets | | 161, 682, 569. 35 | 392. 06 |

|  | June 30, 1953 | June 30, 1954 |
|---|---|---|
| Accounts payable | $86, 550. 30 | $119, 630. 34 |
| Accrued expense | 8, 126. 90 |  |
| Other liabilities (short sales) | 161, 780, 973. 19 |  |
| Capital stock: |  |  |
| Common stock | 700. 00 | 700. 00 |
| Earned surplus and undivided profits | (193, 781. 04) | (119, 938. 28) |
| Total liabilities | 161, 682, 569. 35 | 392. 06 |

The records of Seaboard which were submitted in evidence indicate that Seaboard had similar transactions with 11 other individuals and that the total face amount of notes receivable from all individuals over the period from July 24, 1952, to October 27, 1952, was $161,755,-910.69. Such records do not show any transactions of the same sort after October 27, 1952. They purport to show cash receipt of interest payments in the aggregate amount of $1,186,047.53 during the fiscal year ended June 30, 1954.

In its corporate income tax return for the fiscal year ended June 30, 1953, Seaboard reported total income of $1,401,106.96, consisting entirely of "Gross profit where inventories are not an income-determining factor," total deductions of $1,594,863 (including "Losses" in the amount of $1,579,968.75 and salaries of two officers in the amount of $11,300), resulting in a net operating loss of $193,756.04, and no tax due.

In its return for the fiscal year ended June 30, 1954, Seaboard reported total income of $430,581.89, consisting entirely of "Interest on loans, notes, mortgages, bonds, bank deposits, etc.," deductions of $356,739.13 (including losses on short sales of $327,218.75), no net income after carryover of net operating loss for 1953, and no tax due.

At the time of the petitioner's initial conference with Livingstone in the early part of October 1952, Livingstone produced two ruling letters from the office of the Commissioner of Internal Revenue. One, dated June 30, 1952, was addressed to M. Eli Livingstone and the other dated September 26, 1952, was addressed to Mrs. Louise F. Livingstone. Both dealt with transactions in Treasury notes which, from the descriptions therein, appear to be similar to that entered into by the petitioner with Livingstone and Seaboard. In those letters the Commissioner advised the addressees that interest paid by them to the finance company on their notes was deductible from gross income. In the letter to Louise F. Livingstone the Commissioner advised her that gain on the sale of the Treasury notes, if held for more than 6 months, would be treated as long-term capital gain if she was not a dealer in securities.

The high and low prices of 1⅜ per cent Treasury notes due March 15, 1954, were as follows:

| | High | Low |
|---|---|---|
| Oct. 1–Dec. 31, 1952 | 99⁷⁄₃₂ | 98³¹⁄₃₂ |
| Year 1953 | 100⁷⁄₃₂ | 97 |
| Jan. 1–Mar. 15, 1954 | 100²⁰⁄₃₂ | 100 |

In the income tax return filed by the petitioners for the calendar year 1952 there was reported adjusted gross income from salaries, dividends, interest, and accounting profession, totaling $82,225.65, and net income of $21,580.34. Among the deductions claimed was the amount of $50,000 as interest paid to Seaboard, being the amount represented by the two checks issued by the petitioner to Seaboard on October 30 and December 12, 1952. Reported income did not include any interest on Treasury notes. No interest coupons on such notes matured in 1952 after October 27.

In the income tax return filed by the petitioners for the calendar year 1953, adjusted gross income from salaries, dividends, interest, and accounting profession was reported in the total amount of $201,-114.45. This included interest on Treasury notes in the amount of $120,787.29, being the difference between the amount of $137,500 which would mature in the calendar year 1953 on $10,000,000 face amount of the Treasury notes and the amount of $16,712.71 of interest accrued on the Treasury notes at time of purchase, October 27, 1952. Net income of $22,705.59 was reported. Among the deductions claimed was $170,511.82 as interest paid to Seaboard. That amount results from the following computation:

| | |
|---|---|
| Checks to Seaboard in 1953 | $71,011.82 |
| Credit Treasury notes coupon interest | 137,500.00 |
| Total | 208,511.82 |
| Less refund by Seaboard, June 5, 1953 | 38,000.00 |
| Net amount | 170,511.82 |

In determining the deficiencies the respondent disallowed for each year the deductions claimed for interest paid to Seaboard. He did not make any adjustment to the income items reported.

The petitioner did not pay any interest on indebtedness to Seaboard in 1952 or 1953.

### Debenture Redemption Issue.

In 1950 the petitioner acquired at a cost of $60,000 debentures of the National Key Company (formerly known as Jeco Supplies, Inc.). The debentures were in registered form and the principal was payable in stipulated annual installments on December 31 of each year from 1950 to 1954, inclusive. The aggregate amount of the installments payable through 1954 was $74,000. The portion thereof payable through December 31, 1952, was $71,400. During the calendar year 1952 the company redeemed the bonds in the full amount of their face value, namely, $74,000.

On their joint Federal income tax return for the year 1952 the petitioners reported the gain of $14,000 realized from the redemption of the debentures as long-term capital gain. In the notice of deficiency the respondent made no change in the treatment of that gain. By amendment to his answer the respondent contends that the gain was taxable as ordinary income.

The petitioner concedes that the sum of $2,600 was received as ordinary income. That amount represents the difference between the total of $74,000 received and the amount of $71,400 which, by the terms of the debentures, was payable on December 31, 1952.

### OPINION.

The principal question raised is whether the respondent erred in disallowing deductions in the amounts of $50,000 and $170,511.82 claimed by the petitioners as interest paid to Seaboard in the calendar years 1952 and 1953, respectively.

Section 23 (b), I. R. C. 1939, provides for the deduction from gross income of "[a]ll interest paid or accrued within the taxable year on indebtedness," with a certain exception which is not here material since the income from the Government securities involved herein is not exempt from tax. The term interest on indebtedness has been construed as meaning "compensation for the use or forbearance of money," (*Deputy* v. *duPont*, 308 U. S. 488) and "the amount which one has contracted to pay for the use of borrowed money" (*Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552).

It is the position of the respondent that in substance the petitioner did not borrow any money and that therefore there was no "indebtedness" and no payment of "interest"; that the so-called promissory note was not evidence of indebtedness, but was purely ritualistic and without substance; that the whole transaction was in fact an elaborate and devious masquerade or sham entered into solely for an intended tax benefit and that it should be disregarded for tax purposes.

The petitioner, on the other hand, contends that the record establishes that he bought bonds as a desirable investment, that he made the purchase with borrowed money, and that he paid interest to his creditor.

On October 27, 1952, the petitioner paid $15,000 to Livingstone, purportedly as downpayment on the purchase price of $10,000,000 face amount of United States Treasury 1⅜ per cent notes of March 15, 1954. Livingstone purchased from Devine & Co., a securities dealer, such an amount of the Treasury notes upon the basis of its own credit or funds at the Guaranty Trust Company. The total purchase price, including accrued interest on the Treasury notes, was $9,929,212.71. The remainder of the purchase price, $9,914,212.71, was allegedly loaned to the petitioner by Seaboard, for which the petitioner gave

Seaboard a note in that amount and purportedly pledged the Treasury notes as security with Seaboard. Neither the petitioner nor Seaboard, however, ever had possession of the Treasury notes. They were held by Guaranty Trust Company for clearance and were redelivered to Devine on the same date, within approximately one-half hour, upon instructions of Livingstone, and Devine issued its certified check to Livingstone in payment therefor.

Seaboard did not actually pay over any funds to the petitioner or to petitioner's broker, Livingstone. Indeed, the record indicates that Seaboard did not have funds. It was incorporated in 1952 and its balance sheet showed no assets at July 1, 1952, which apparently was the beginning of its first fiscal year. At June 30, 1953, the close of its first fiscal year, it had cash of $741.81 and notes and accounts receivable of $162,688,123.59, which, it would appear from the record, arose entirely out of the transaction with the petitioner and similar transactions with others.

This immediately raises the question of the reality of the alleged loan by Seaboard to petitioner of $9,914,212.71. From what source could Seaboard have loaned such an amount to the petitioner? The petitioner's explanation is that Livingstone, as agent for Seaboard, sold short an equivalent amount of Treasury notes. He states that Seaboard did not own the particular Treasury notes, but merely had a pledgee's title, with the right to "use the securities pledged for any purpose * * * not inconsistent with petitioner's rights of ownership." He states on brief that acting under this power, Seaboard "borrowed petitioner's Treasury Notes to fulfill its short sale commitment," and, at another point in the brief, that Seaboard exercised "its right to use those bonds to cover its own short sale," its only obligation to petitioner being to produce an equivalent amount of Treasury notes of the same issue upon tender by petitioner of the amount he owed. He then concludes that "[t]hrough that short sale Seaboard came into possession of funds which it loaned to petitioner, thus enabling petitioner to complete his purchase."

The petitioner does not further elaborate. We do not know how the transaction was carried on the books of Livingstone since such records are not in evidence. Nor do we have the benefit of the testimony of M. Eli Livingstone, who conceived the plan of financing and made all the arrangements. Livingstone was the only party who had expended funds, aside from the $15,000 expended by the petitioner, and it is reasonable to assume that the actual proceeds from the resale would not have been made available to either Seaboard or petitioner. If a credit in the amount of the sales price was set up and made available to Seaboard and such credit was transferred to the petitioner in the form of a loan and was then transferred back to

Livingstone, we think that under the facts of this case these would be mere bookkeeping entries insufficient to constitute a debtor-creditor relationship between the petitioner and Seaboard. At the conclusion of the transactions on October 27, the Treasury notes had been transferred back to Devine, Livingstone had recovered the funds which it had expended, and neither the petitioner nor Seaboard actually held any Treasury notes.

We think it obvious from the whole record that all the steps taken were pursuant to a preconceived plan which lacked substance and which was entered into solely to form the basis for a claimed tax benefit. The actual purchase by Livingstone of $10,000,000 face amount of Treasury notes was consummated only to give color to the transaction, and, as pointed out, these notes were disposed of immediately. We think it apparent that it was the intention of all the three participants that the petitioner would not purchase the Treasury notes, that there would be no actual loan to the petitioner, and that he would not pay any interest. He did not risk any borrowed money. The only amount he actually paid out and risked was the $15,000.

The petitioner, in an attempt to show that he was not party to a prearranged plan, testified that he did not give an order for the sale of the Treasury notes, and that he did not know of the sale at the time it occurred. However, the evidence shows that he did, in preliminary conferences, discuss the proposed transaction with M. Eli Livingstone, including the tax consequences, and that in his note given to Seaboard he authorized Seaboard to use the securities. Accordingly, any action taken must be considered to have been at least with his acquiescence.

The fact is that the petitioner did not make any payments of interest to Seaboard despite his contention that throughout the period October 27, 1952, to January 19, 1954, he continued to own the Treasury notes or was entitled to an equivalent amount and that throughout that period he paid the full amount of interest called for by his note. He claims that he paid by check $50,000 in 1952 and a net amount of $33,011.82 in 1953. He also claims that in 1953 he paid $137,500 through the crediting by Seaboard of that amount of Treasury note interest on his obligation to pay interest. Apparently his position is that although the particular Treasury notes which had been purchased had been disposed of the same day they were acquired, there was a continuing obligation on Seaboard, either as pledgee, or borrower thereof for short sale purposes, to credit him with an amount equivalent to interest on $10,000,000 face amount of Treasury notes, that Seaboard did so credit him in the amount of $137,500 in 1953 against his liability for interest on his own note, and that this entitles him to deduct such amount.

The petitioner did issue 2 checks in 1952, 1 on October 30, in the amount of $40,000 and 1 dated December 12, in the amount of

$10,000. Each bore a notation that it was in part payment of interest, and the letter accompanying each also stated that the check was for interest. No reason is shown why the petitioner would make payment of interest within 3 days after the execution of his note for the principal amount, which does not specifically provide for such an early payment of interest, but merely provides for interest of 2⅜ per cent per annum. The petitioner also issued a number of checks during the year 1953, each similarly characterized as interest. However, in each instance in both 1952 and 1953 the petitioner, at or about the same time, received back the same amount from Seaboard, apparently by check, and in each case gave a note therefor to Seaboard.

The petitioner testified, "I paid first. I had the funds to pay it with. Then if I needed the money, I borrowed it back from them; I borrowed it again from them." It seems a strange coincidence that the petitioner "needed" the exact amount of money immediately. Actually there was a mere exchange of payments by check, which offset each other, with the result that there was no actual payment. The notes which were given by the petitioner in each instance were not put in evidence and we are not advised as to the terms thereof. Nor is there any showing by the petitioner that he ever actually paid them.

Furthermore, under the facts of this case, it cannot be considered that there was in effect any payment of interest by the petitioner through the application by Seaboard of coupon interest on any Treasury notes. Quite evidently Seaboard never did actually receive any interest on Treasury notes on behalf of the petitioner, since the original Treasury notes had been sold. Indeed its records do not contain entries in 1953 applying matured coupon interest toward any interest obligation of the petitioner. But even if there were such entries this would not further the petitioner's contention, in the view we take of the case.

It might be argued that the "interest" notes were in effect paid on January 19, 1954, when, according to the records of Seaboard, that company closed out the transaction on the basis of a purported sale by Livingstone of $10,000,000 United States Treasury notes upon the order of the petitioner or his assignee, Morris Falk Foundation, for a total selling price of $10,075,984.12, which, together with $137,500, the amount of interest coupons which would have matured on $10,000,-000 face amount of Treasury notes in this interim, would have been more than sufficient to cover the original principal liability of the note in the amount of $9,914,212.71 and interest thereon (which according to the petitioner's brief would amount to $293,020.51 from October 27, 1952, to January 19, 1954, at 2⅜ per cent plus $3,193.11 representing the prepayment penalty of ¼ of 1 per cent). However, the petitioner does not advance this argument. Indeed, since he was on the cash

basis, such a view would be inconsistent with his contention that he paid interest in his taxable years 1952 and 1953.

As indicated above, the transaction was purportedly concluded on January 19, 1954. The books of Seaboard purport to show as of that time a delivery of Treasury notes to fulfill its obligations either to the petitioner for "borrowing" the original Treasury notes or to Livingstone to cover a short sale, or both. Such books purport to show an application of the proceeds from the sale of such Treasury notes to satisfy the petitioner's principal and interest obligation to Seaboard, with an excess of $379.75 being paid to the Morris Falk Foundation. Also, Livingstone issued a confirmation slip to show a sale of $10,000,-000 of Treasury notes on January 19, 1954, on behalf of the Morris Falk Foundation. There is no showing that in fact Seaboard did acquire any Treasury notes at that time or that there was an actual sale to close out the transaction. Be this as it may, the purported transactions would, in the light of what has been said above, in any event constitute no more than transactions entered into to lend color to a claimed obligation to pay interest which we have concluded was without substance.

The Supreme Court has often held that the incidence of taxation depends upon the substance of a transaction. *Gregory* v. *Helvering*, 293 U. S. 465; *Commissioner* v. *Court Holding Co.*, 324 U. S. 331; *Griffiths* v. *Helvering*, 308 U. S. 355; *Bazley* v. *Commissioner*, 331 U. S. 737. See also *Gilbert* v. *Commissioner*, 248 F. 2d 399. The following language in *Gregory* v. *Helvering*, *supra*, is particularly apt here:

The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

Seaboard was, in our opinion, utilized merely for the purpose of recording the payment of interest, whereas in fact the petitioner paid no interest. Bookkeeping entries, although evidence of the facts which they purport to record, are not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179; *Commissioner* v. *North Jersey T. Ins. Co.*, (C. A. 3) 79 F. 2d 492; *Woods Lumber Co.*, 44 B. T. A. 88; *Corn Exchange Bank*, 6 B. T. A. 158; *Chatham & Phenix National Bank*, 1 B. T. A. 460. We think the transaction was devoid of substance and that it should be ignored for tax purposes. In any event the petitioner, upon whom rests the burden of proof, has not shown that it did have substance. See *Weyl-Zuckerman & Co.*, 23 T. C. 841, affd. (C. A. 9) 232 F. 2d 214.

We hold that the respondent did not err in disallowing the claimed interest deductions for the years 1952 and 1953.

The petitioner testified that he entered into the transaction here involved in reliance on the two ruling letters referred to in the Find-

ings of Fact addressed by the respondent to the Livingstones. He claims that the respondent has, in effect, repudiated those rulings retroactively and that this is a gross abuse of the power conferred on him by section 3791 (b), I. R. C. 1939.[3] He refers to the cases of *Automobile Club* v. *Commissioner*, 353 U. S. 180, and *Lesavoy Foundation* v. *Commissioner*, (C. A. 3) 238 F. 2d 589.

Even if it were assumed that this Court has jurisdiction to review the respondent's exercise of discretion under section 3791 (b), which we do not here decide, the facts here would not in any event sustain a holding that the respondent had acted arbitrarily as to the petitioner. The only ruling published by the respondent with regard to this type of transaction is Revenue Ruling 54–94, 1954–1 C. B. 53, in which the respondent concluded that as a matter of substance there was no payment of interest. There had been no previous published general ruling upon which the petitioner could have relied in entering into the transaction, nor did the respondent at any time issue to the petitioner an individualized favorable ruling. While the transactions which had been entered into by the Livingstones and which were the subject of the ruling letters in question appear to have been similar to the instant transaction, such rulings do not purport to pass upon the petitioner's specific transaction. Even if the respondent had issued a favorable ruling to the petitioner, he would have the authority to correct such ruling if he concluded it was erroneous. *Automobile Club* v. *Commissioner, supra.* A postulate of the Livingstone rulings was that interest was paid. The respondent having determined a deficiency against this petitioner, it is our duty to determine whether there was any payment of interest on indebtedness, and we have concluded that there was not.

It may be further added that even if the transaction were considered as one of substance, the petitioner, being on the cash basis, would not, under the circumstances here disclosed, be entitled to a deduction for interest in either of the taxable years 1952 or 1953. There was no *payment* of interest. At best there would be no more than the giving of notes to evidence a liability for interest. It has been held many times that in the case of taxpayers on the cash method of accounting, the giving of notes to cover liability does not satisfy the statutory requirement of payment and does not permit a deduction from gross income. *Eckert* v. *Burnet*, 283 U. S. 140; *Helvering* v. *Price*, 309 U. S. 409; *Hart* v. *Commissioner*, (C. A. 1) 54 F. 2d 848, affirming 21 B. T. A. 1001; *Keith* v. *Commissioner*, (C. A. 2) 139 F.

[3] SEC. 3791. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect.

2d 596, affirming a Memorandum Opinion of this Court; *S. E. Thomason*, 33 B. T. A. 576; *Nina Cornelia Prime, Executrix*, 39 B. T. A. 487; *Walter J. Bemb*, 5 T. C. 1335; and *Cleaver* v. *Commissioner*, (C. A. 7) 158 F. 2d 342, affirming 6 T. C. 452. Cf. *Newton A. Burgess*, 8 T. C. 47, which is distinguishable on its facts from the instant case.

In view of our holding that the transaction lacked substance, it follows that the petitioner was not in receipt of coupon interest on any Treasury notes in the year 1953. Therefore, as alternatively alleged by the petitioner, there should be eliminated from taxable income the amount of $120,787.29 which he had reported from this source.

The petitioner also alternatively alleges in the petition that he should be allowed a loss for 1952 in the amount of $14,722.02, this being the amount of his cash outlay of $15,000 less an amount of $277.98 which he states that he recovered. The details of such recovery are not shown. Nor is there any discussion or argument presented on brief concerning this assignment of error.

The payment of $15,000 on October 27, 1952, purported to represent a downpayment by the petitioner on the purchase of $10,000,000 face amount of Treasury notes. As stated hereinabove, we think that the petitioner did not purchase and did not intend to purchase $10,000,000 face amount of the Treasury notes. Consequently, this $15,000 did not constitute a downpayment on any such purchase. Rather, the conclusion is inescapable that the $15,000 was paid as a fee to Livingstone for carrying out the various steps in the plan, including its purchase of $10,000,000 face amount of Treasury notes and holding them briefly to give the appearance of substance to the entire transaction, whereas in truth the transaction lacked substance and was entered into only for the purpose of obtaining a tax benefit. Since the petitioner did not intend to purchase and did not purchase any Treasury notes, it cannot be said that there was a transaction entered into for profit within the meaning of section 23 (e) of the Internal Revenue Code of 1939.[4] This statutory provision first appeared in section 5 (a) Fifth of the Revenue Act of 1916, but the deduction of losses from transactions entered into for profit was limited to an amount not exceeding the profits arising therefrom. In the corresponding provision contained in section 214 (a) 5 of the Revenue Act of 1918, such limitation was deleted. It is clear that the type of transaction to which the statute refers is one which has substance and

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

* * * * * * *

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

* * * * * * *

(2) if incurred in any transaction entered into for profit, though not connected with the trade or business : * * *

in which there is a true motive of deriving a profit. We hold that there is no statutory authority for the allowance of any part of the $15,000 as a deduction.

### Debenture Redemption Issue.

The petitioners in 1950 acquired registered debentures of National Key Company (formerly known as Jeco Supplies, Inc.) at a cost of $60,000. The principal amount of the debentures was $74,000, which was payable periodically over the years 1950 to 1954 with the final payment to be made on December 31, 1954. The principal sum payable on these debentures through December 31, 1952, was $71,400. On that date the issuing company redeemed the debentures by paying to the petitioner an amount which, together with payments previously made, aggregated $74,000.

The petitioners reported their $14,000 gain as long-term capital gain and that was not changed by the respondent in determining the deficiency for the year 1952. The petitioners now concede that $2,600 of their gain constituted ordinary income, but contend that the remainder of the gain is taxable as long-term capital gain under section 117 (f) of the Internal Revenue Code of 1939,[5] pursuant to the decision in *George Peck Caulkins*, 1 T. C. 656, affd. (C. A. 6) 144 F. 2d 482. The $2,600 is the difference between the $71,400 payable by the terms of the debentures through December 31, 1952, and the $74,000 paid to them on that date.

The respondent concedes that the debentures were in registered form within the meaning of section 117 (f). He also apparently concedes that the instant case comes within the holding of the *Caulkins* case. At least he does not show that that case is distinguishable. He does contend, however, that the doctrine of the *Caulkins* case is incorrect. It is his position that the amount received upon the redemption of a bond or other evidence of indebtedness which represents original or initial discount constitutes interest which is taxable as ordinary income, and that it was never intended by Congress that it be treated otherwise.[6]

The instant case falls squarely within the holding in the *Caulkins* case. The various contentions were carefully analyzed by this Court and by the Court of Appeals for the Sixth Circuit in the *Caulkins* case, and it was concluded that under the language of section 117 (f)

---

[5] SEC. 117. CAPITAL GAINS AND LOSSES.

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.

[6] The respondent's position is detailed in two published Revenue Rulings: Rev. Rul. 55–136, 1955–1 C. B. 213, and Rev. Rul. 56–299, 1956–1 C. B. 603.

there was no alternative to holding that the full amount received upon redemption was to be treated as amounts received in exchange for the evidences of indebtedness there involved. In the instant case the respondent advances no additional arguments in support of his position. He has cited no intervening judicial authority which would indicate that the *Caulkins* case was incorrectly decided nor has any come to our attention. Under the circumstances, we adhere to the position previously taken in the *Caulkins* case and hold that the petitioners properly reported their gain on the redemption of the debentures as long-term capital gain, except for the $2,600 as to which they concede error.

*Decision will be entered under Rule 50.*