Walsh Food Service, Inc., et al. [1] v. Commissioner. Walsh Food Service, Inc. v. Commissioner
Docket Nos. 2697-63 - 2699-63.
United States Tax Court
T.C. Memo 1966-57; 1966 Tax Ct. Memo LEXIS 224; 25 T.C.M. (CCH) 318; T.C.M. (RIA) 66057; March 18, 1966
*224 Petitioners accrued bonuses payable to their stockholder-employees each year in a total amount which reduced corporate income below $25,000. Within 2 1/2 months after the close of each fiscal year petitioners issued checks in payment of the accrued bonuses. Though in some instances the petitioners' bank accounts were insufficient to cover the bonus checks on the day they were issued, all bonus checks were immediately deposited by their recipients and paid in due course. Within a few days after receipt of their bonuses the stockholder-employees would loan back to the petitioners the identical amounts. Held: The bonuses were actually paid by petitioners within the meaning of section 267(a)(2), I.R.C. 1954, and includable in the gross income of the recipients, on the dates the bonus checks were issued. Petitioners are entitled to deduct such bonus payments. Ronald M. Mankoff and Wentworth T. Durant, Fidelity Union Tower, Dallas, Tex., for the petitioners. Thomas J. Moroney, Jr., for the respondent. HOYT
Memorandum Findings *226 of Fact and Opinion HOYT, Judge: Respondent determined the following deficiencies in income tax: Docket No. 2697-63
Docket No. 2698-63
Walsh Food
Walsh Food
Docket No. 2699-63
Fiscal Year Ended
Service,
Finance,
Artic Frozen
September 30
Inc.
Inc.
Foods, Inc.
1957
$ 21,217.84
$ 8.25
1958
43,730.04
2,491.52
$ 9,316.99
1959
35,737.36
3,821.45
7,202.67
1960
6,690.49
5,600.97
10,714.54
1961
8,629.89
Total
$107,375.73
$11,922.19
$35,864.09
These three cases have been consolidated for trial, briefing and opinion. The petitioners having conceded all other issues raised by their petitions, the sole issue remaining in each of the case is whether certain employee bonuses accrued during each of the tax years here involved were actually "paid" to the employees within two and one-half months after the close of those respective years within the meaning of section 267(a)(2) of the 1954 Code, or whether said bonuses remained unpaid and nondeductible under that section. Findings of Fact Some of the facts have been stipulated; the Stipulation of Facts and exhibits referred to therein are incorporated herein by this reference. *227 Petitioner, Walsh Food Service, Inc., (hereinafter referred to as "Service"), was engaged in the business of processing and selling at retail meats and frozen foods. Petitioner, Walsh Food Finance, Inc., (hereinafter referred to as "Finance"), was in the business of financing the retail purchase of food freezers and household appliances. Petitioner, Artic Frozen Foods, Inc., (hereinafter referred to as "Artic"), was in the business of selling frozen foods to institutional purchasers such as hotels, restaurants, and hospitals. Petitioners each employed the accrual method of accounting, and reported income on the basis of a September 30 fiscal year. Each petitioner filed its income tax returns for the years involved in its respective docket number with the district director of internal revenue at Dallas, Texas. All three petitioners were incorporated as Texas corporations in December 1956. The original stockholders and the number of shares of common voting stock held by each upon incorporation were as follows: Service
Finance
Artic
W. D. Walsh
111
54
222
Jack Walsh
55
27
111
Jim Walsh
55
27
111
Frank Walsh
55
27
111
George Walsh
55
27
111
Tom Walsh
55
27
111
Joe Walsh
55
27
111
Leland Walsh
55
27
111
*228 These shares comprised all the issued and outstanding stock at the time of incorporation of each petitioner. On December 31, 1958, W. D. Walsh transferred to Bob Walsh 17 shares of Service stock, 8 shares of Finance stock and 35 shares of Artic stock. All of the above-named shareholders are related in that W. D. Walsh is the father of the other eight Walshes, all of whom are brothers by the whole blood. W. D. Walsh was president of each of the corporations, and he and all eight of the boys were the directors of each. All of the shareholders were employees of and performed services for one or more of the three petitioners generally through the period of years here involved. A few days prior to the end of each of the fiscal years here involved, W. D. Walsh would determine the amount of bonus compensation that each of the three corporations should pay to its stockholder-employees. [2] At the time he made these determinations, he "pretty well knew" what each corporation's net income for the fiscal year would be. The proposed bonuses were submitted to the board of directors of the respective petitioners, and in each instance the board duly authorized the bonuses as recommended by W. *229 D. Walsh. Bonuses so approved were accrued on petitioners' books prior to the close of the fiscal year, but they were not paid prior to the close of the fiscal year. The bonuses accrued as described above were in addition to the salaries received by the Walshes during the fiscal years involved. The following table indicates for the fiscal years involved the salary and bonuses received by all of the Walshes collectively and the net income after accrued bonuses for each of the petitioners (cents omitted): [3]
Net Income
Salaries
Bonuses
After Bonuses
Walsh Food Service
1957
$24,875
$40,500
$23,933
1958
30,505
83,000
20,228
1959
32,965
69,000
24,883
1960
35,337
13,500
23,681
Walsh Food Finance
1958
6,950
5,000
24,506
1959
7,950
8,000
23,461
1960
7,950
11,000
24,458
Artic Frozen Foods
1958
16,645
20,000
20,077
1959
15,755
15,000
22,920
1960
17,365
21,000
24,066
1961
19,315
17,000
24,044
*230 Not all of the stockholder-employees received a salary from each petitioner, but they all were credited with a bonus from each petitioner corporation in every fiscal year here involved. The amounts of the individual bonuses varied among the recipients and in no year were all of the Walshes granted equal bonuses by any of the three petitioners. The accrued bonuses reduced the corporate profits of each petitioner for each of its fiscal years here involved to a sum less than $25,000. Before the 15th of December following the close of each fiscal year, on September 30, the corporations would each draw and deliver checks to all of the Walshes in the amount of their respective accrued bonuses less withholding tax thereon. The tax withheld from these bonus checks was promptly posted to petitioners' books and put into the regular Government depositories. The bonus checks were delivered and accepted as payment for the bonuses and were not subject to any agreement that they were not to be cashed, deposited or presented for payment. The checks were deposited by each of the Walshes to his own bank account; none of them was ever endorsed and returned to any of the petitioners. All checks were *231 honored and paid when presented to the bank on which they were drawn. Each of the petitioner corporations had its own checking account at the Amarillo National Bank. In most instances during the years here involved, the petitioners' account balances were not sufficient (after reduction by the total of their outstanding checks), on the day the bonus checks were issued, to cover the total of the bonus checks. In most instances, however, the account balances were of sufficient size to permit payment of the bonus checks on the day of issue if the balances were not reduced by the total of outstanding checks. In two instances Service did not have a large enough balance on the date bonus checks were issued to cover those checks even before reduction of the balance by then-outstanding checks. However, as pointed out above, none of these bonus checks (all of which were presented for payment) was ever dishonored, nor has any check of any of the petitioners ever been dishonored. The petitioner corporations borrowed regularly from Amarillo National Bank during the period in question. If petitioners had not had sufficient bank balances to cover checks when presented at the bank for payment, *232 the bank would have advised them, and arrangements could have been made for the bank to lend a sufficient amount of cover the overdrawn account. Petitioners had established credit with the bank so that they could have borrowed sufficient funds to cover all outstanding checks (including bonus checks) in excess of their respective balances each year on the day bonus checks were issued. In addition, petitioners could have raised sufficient funds to cover outstanding checks in the instances mentioned above by deferring the payment of merchandise accounts on which they ordinarily made prompt payment to take trade discounts. In instances when one of the petitioners had issued checks in excess of its bank balance and one or both of the others had not, a temporary loan could have been arranged from the latter to the former. The Walshes all prepared their personal tax returns on the cash basis, using a calendar year. On their income tax returns for the calendar year which encompassed the last nine months of the petitioners' fiscal years here involved, they all reported as compensation income the full amount of bonuses (i.e., gross amount before withholding) represented by the bonus checks *233 they received and deposited each December. Usually within one to ten days after the receipt of his bonus check each of the Walshes delivered his personal check to the petitioners as a loan. In the year 1957, the amount of loans made by the Walshes to petitioners was not as great as the amount of net bonuses received by them; in each of the other years here involved the total amounts loaned by them were exactly equal to the net amounts of bonuses received. After receipt of loan checks from all of the Walshes, the petitioners executed notes, the total face amount of which was equal to the net bonuses loaned back to them by the Walshes. Although the bonuses declared and paid to the Walshes varied in amount each year among them, the notes which were issued evidencing the return of the net bonuses as loans were substantially similar in amount as to all but one of the Walshes (Bob Walsh was the only exception). Thus, in effect, those members of the family who had received larger bonuses allocated a portion of their bonuses to those who had received smaller amounts, by accepting notes from the petitioners in amounts which were less than the net bonuses loaned back to the petitioners. Those *234 who had received smaller bonuses received notes from the petitioners in a total amount which exceeded the net bonuses they had received and loaned back, so that all of the shareholders (except Robert) ended up with substantially the same total amount of notes receivable from the corporations. Each petitioner recorded the total amount of notes issued, in its regular books of account, as notes payable to shareholders; however, they did not formally record a breakdown of this total to indicate the amount of each individual note. The notes to shareholders carried interest only after maturity thereof. The notes were not held by the individual obligees, but were all held in the private drawer of W. D. Walsh in the "company safe." On September 19, 1960, Artic voted to increase its capital stock by $25,000. Each stockholder received an additional 30 shares with the exception of Bob Walsh who received 10 additional shares. This increase in capital was effected through the cancellation of notes payable to each of the shareholders. At all material times subsequent to this issuance of stock, the total shares of the petitioners were held as follows: Service
Finance
Artic
W. D. Walsh
94
46
217
Jack Walsh
55
27
141
Jim Walsh
55
27
141
Frank Walsh
55
27
141
George Walsh
55
27
141
Tom Walsh
55
27
141
Joe Walsh
55
27
141
Leland Walsh
55
27
141
Bob Walsh
17
8
45
*235 There were no other payments on the stockholder loans during the years here in question. In 1963 Artic repaid each stockholder an unspecified amount to be used in paying a franchise tax which had been overlooked when another family corporation (not here involved) was liquidated. In 1964, Joe and Bob Walsh each needed some cash. W. D. Walsh "called all the other boys together," and it was decided that a loan repayment of $4,000 would be made to each of the creditor-stockholders. [4] No other repayments were made on the stockholder loans up until the time of trial. In his notices of deficiency respondent disallowed deductions for bonuses claimed by all three petitioners for 1958, 1959 and 1960, as well as bonuses claimed by Service for 1957 and by Artic for 1961. In all instances respondent's explanation was substantially as follows: Your purported distribution of bonuses * * * represents a tax avoidance scheme. Your claimed bonuses * * * are disallowed as deductions since your purported bonuses were not ultimately distributed to your employees or stockholders, but were retained by *236 you in your business. Finding of Ultimate Fact The bonuses deducted by petitioners were paid on the dates that the bonus checks were issued. Opinion It is important to note at the outset that respondent relies solely on section 267 of the 1954 Code for his disallowance of petitioners' deductions for the bonuses here in issue. Respondent does not argue that any of the bonuses, if actually paid, were other than ordinary and necessary business expenses; he does not contend that they should be treated as disguised dividends, or that any of the employee-stockholders were paid unreasonably high compensation for services rendered. Respondent bases his entire case on the argument that the bonuses were neither paid by the corporations nor includible in the income of the recipients. Section 267 provides in pertinent part as follows: SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions Disallowed. - No deduction shall be allowed - * * *
(2) Unpaid expenses and interest. - In respect of expenses, otherwise deductible under *237 section 162 or 212, or of interest, otherwise deductible under section 163, - [Emphasis supplied.] (A) If within the period consisting of the taxable year of the taxpayer and 2 1/2 months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) If, at the close of the taxable year of the taxpayer or at any time within 2 1/2 months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b). (b) Relationships. - The persons referred to in subsection (a) are: * * *
(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; * * *
(c) Constructive Ownership of Stock. - For purposes *238 of determining, in applying subsection (b), the ownership of stock - * * * (2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family; * * *
(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; and * * *
The facts clearly indicate, and petitioners do not dispute, that with one exception all of the subsections quoted above are applicable here. The single exception, and the center of controversy in this case, is subsection 267(a)(2)(A). Respondent contends that the bonuses accrued at the end of each fiscal year here involved were not actually "paid" within 2 1/2 months after the close of each respective year. There is no question that the bonus checks were written and delivered to the payees within the 2 1/2 month period, but respondent contends that because the checking accounts on which the bonus checks were written did not always have sufficient balances to cover those checks when they were issued, and because the amounts of the net bonuses were immediately returned to the taxpayers, "the manner in which the *239 bonuses were allegedly paid amounted to a mere subterfuge for payment." Preliminarily, it would be well to indicate that we are not unaware of the implication, raised by the facts, that there has been a deliberate effort by petitioners, by declaring bonuses, to reduce their net taxable income each year to an amount just slightly below $25,000 to avoid having any corporate income taxed at surtax rates. Although two of the Walshes testified that the amounts of bonuses each year were based on services rendered and not upon tax considerations, it would require a considerable degree of naivete for us to accept such testimony without question. In the five fiscal years here involved bonuses paid by the three corporations varied from a low of $5,000 (Finance in 1958) to a high of $83,000 (Service in 1958), while net income after bonuses varied only between $20,000 and $25,000. Respondent attempts to derive support from these facts. However, even if we were to find that the bonus payments each year were designed solely to avoid the corporate surtax, this would have little bearing on the question whether the bonuses were actually "paid" within the meaning of section 267(a)(2)(A). Such a *240 finding would be relevant to a determination of whether the bonuses were ordinary and necessary expenses or whether the bonuses were disguised dividends, but as already indicated, respondent has not raised these questions. [5]
We think there can be little doubt that the accrued bonuses were paid in the instant case on the dates the bonus checks were delivered to the payees. The delivery of a check constitutes the act of payment for tax purposes. Estelle Broussard, 16 T.C. 23 (1951); Estate of Modie J. Spiegel, 12 T.C. 524 (1949), acq. 1949-2 C.B. 3. Some cases have even held that there is constructive payment when the amount accrued is merely credited to or set apart for the payee so that it may be drawn upon by him without any substantial limitation or restriction. Geiger & Peters, Inc., 27 T.C. 911 (1957), *241 acq. 1957-1 C.B. 4; Ohio Battery & Ignition Co., 5 T.C. 283 (1945), acq. 1946-1 C.B. 3; Michael Flynn Manufacturing Co., 3 T.C. 932 (1944), nonacq. 1944 C.B. 38 withdrawn, acq. 1945 C.B. 3. But see Granberg Equipment, Inc., 11 T.C. 704 (1948). Respondent contends that the bonus checks did not constitute payment since in most instances there was not sufficient cash in the bank accounts to cover the bonus checks on the days they were drawn. This argument is completely unacceptable, particularly in light of the fact that every one of the bonus checks was in fact deposited by the recipient and in due course presented and paid by petitioners' bank. Respondent contends that actual payment of the checks is not necessarily significant since the funds used to cover these checks were provided by the stockholder-officers' personal checks in the amount of the net bonuses received.[6] It is difficult to determine from the record whether this contention is correct; however, the fact remains that even if the net bonuses had not been loaned back, these checks would have been paid. Each of the petitioners *242 could have increased its cash account sufficiently to cover all bonus checks by either post-poning payment of trade bills or borrowing from the bank or from one of the other petitioners. It has been held repeatedly that the absence of cash on hand is not significant when there is a clear showing of ability to borrow. Geiger & Peters, Inc., supra; Platt Trailer Co., 23 T.C. 1065 (1955), acq. 1955-2 C.B. 8; Ohio Battery & Ignition Co., supra.
Respondent also attempts to make much of the fact that all of the bonus recipients immediately returned their bonuses as loans to the petitioners. We fail to see how the choice made by the recipient of a bonus as to what he wants to do with the money after he has received it, whether it be to spend it, save it, invest it, lend it or give it away, has any direct bearing on the question whether or not the bonus was actually paid to him. Respondent apparently takes the view that, since for several successive years each of the nine bonus recipients *243 elected to lend his bonus back to the petitioners, it is clear that this unanimity of action could not have been coincidental, and the stockholder-employees must have acted in concert according to a plan under which it was mutually understood that each would return his bonus as a loan. It is argued that the presence of such an understanding, even if not in writing, indicates that all of the bonuses carried with them such restrictions on the unfettered use of the funds, that they were, therefore, in reality never received or paid. With this we cannot agree and hold instead that the bonus payments were irrevocable and unqualified. While we agree with respondent that it is probably beyond mere coincidence that each of the Walshes every year chose to return his bonuses to the payor corporations, we cannot infer from this circumstantial evidence that there was in fact such a legally binding restriction on the disposition of the bonus money as to require a holding that what was in form a payment was not one in substance. Edgar M. Soreng, 4 T.C. 870 (1945), affd. 158 F. 2d 340 (C.A. 7, 1946); Michael Flynn Manufacturing Co., supra. The corporations *244 withheld taxes due on the bonus payments. All of the Walshes reported their bonuses as income in their individual returns for each of the calendar years in which they received their bonus checks. Such conduct, although not conclusive, tends to indicate that the payors and the employee-stockholders considered the bonus checks as representing payments subject to the unfettered control of the recipients and not subject to any tacit or implied agreement to return the money. Geiger & Peters, Inc., supra; Platt Trailer Co., supra. The only direct evidence in the record is the clear and uncontradicted testimony of two of the Walshes that there never existed any agreement among the employee-stockholders binding them to return their bonuses to the petitioners. Whether or not the Walshes may have chosen to act in concert with an incidental mutual motive of minimizing taxes is not crucial, as long as there was no binding obligation which prohibited any one of them from taking independent action and disposing of his bonus in any manner he should choose. Petitioners have established to our satisfaction that there was no such legally binding obligation. We conclude *245 on all of the evidence before us that the decision of the Walshes here, father and sons, to lend their bonuses back to the family businesses in which all of them were vitally interested and engaged was voluntary. Respondent, taking an overall view of the situation, asserts that petitioners were in the same financial condition after the completion of the bonus-loan-back transactions each year as they were before the issuance of bonus checks, that the Walshes, in effect, received nothing, and that the whole process was nothing more than a paper transaction. We cannot agree. Petitioners were not in the same financial position after the bonus transactions. They may have been in the same cash position, but their net worth was reduced by the amount of bonuses; this is clearly a change in financial position. The Walshes received additional compensation for their services which respondent does not contend was other than compensation or unreasonable, and they ended up with notes representing enforceable claims against petitioners' assets. Furthermore, they properly reported the bonuses as taxable income and thereby subjected themselves to personal income tax. All of these were very real net *246 economic and financial consequences which would not have occurred had the bonus transactions here involved never taken place. These were not "sham" transactions of the "Livingstone" type, devoid of economic consequences. Compare Eli D. Goodstein, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959). H. & H. Drilling Co., Inc., 15 T.C. 961 (1950), relied upon by respondent, is clearly distinguishable on its facts from the instant situation. In that case we relied, inter alia, upon the taxpayer's failure to prove that sufficient cash was or could have been made available to pay the accrued salary. The purpose of section 267 and its predecessor, section 24(c) of the 1939 Code, is to eliminate the tax avoidance practice of an accrual basis taxpayer accruing unpaid expenses and interest payable to a closely related taxpayer who, because he is on the cash basis, need not report the amount as income. Because of the relationship between the taxpayers, payment might never be required or it might be postponed until the related taxpayer has offsetting losses. Geiger & Peters, Inc., supra, and authorities cited therein at page 917. *247 Here all the bonuses for which deductions are sought were in fact reported in the personal tax returns of the recipients. Hence, as the court stated in Musselman Hub-Brake Co. v. Commissioner, 139 F. 2d 65 (C.A. 6, 1943): There was no tax evasion in fact, and the evil which the enactment of Section 24 [1939 Code] sought to remedy was not present. It appears that the real "evil" which respondent sees in this situation is the consistent reduction of corporate income to a level just below the level above which it would be taxed at surtax rates. Section 267 is impotent against this kind of alleged evil when it is clear, as it appears to us in this case and as we here hold, that the bonuses were in fact reasonable compensation paid and includable in the gross income of the recipients on the dates the bonus checks were issued. To reflect certain concessions of petitioners on other issues. Decisions will be entered under Rule 50 in Docket Nos. 2697-63 and 2698-63. Decision will be entered for petitioner in Docket No. 2699-63. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Walsh Food Finance, Inc., Docket No. 2698-63; and Artic Frozen Foods, Inc., Docket No. 2699-63.↩
2. Nonstockholder employees were also paid bonuses, but these bonuses are not involved in the instant case.↩
3. There are slight discrepancies in the figures contained in the stipulated documents from which this table is derived. They are not material, however.↩
4. The record does not indicate how many or which of the three petitioners made the payments.↩
5. Section 267(a)(2), upon which respondent relies exclusively is only applicable to expenses or interest "otherwise deductible under section 162 or 212↩" or 163.
6. A process familiarly known as "kiting" checks.↩