Opinion

per curiam:

This case was referred by the court, pursuant to Rule 45 (a), to Mastin G. White, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed October 17, 1958. When the more than 15 days provided by Rule 46 (a) had -elapsed after the filing of this report, and neither party had *299 given, notice in writing of an intention to except to the recommendations and findings of the trial commissioner, the defendant filed a motion for judgment in accordance with the commissioner’s report. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Plaintiffs’ petition will be dismissed.
It is so ordered.
OPINION OE THE COMMISSIONER
The principal question involved in this case is whether Mrs. Broome’s checks in the amounts of $16,500, $20,000, and $56,814.02 which were transmitted to the Seaboard Investment Corporation in 1952, 1953, and 1954, respectively, and her check in the amount of $30,870 which was transmitted to the Corporate Finance and Loan Corporation in 1954, constituted interest payments and, therefore, were properly deductible for income tax purposes.
Taking up first the matter of the checks that were transmitted to the Seaboard Investment Corporation, they must be considered in the light of the overall transaction of which they were a part. That transaction involved, at least in form, a sale by Livingstone & Company to Mrs. Broome on October 6, 1952 of U. S. Treasury 1% percent notes having a maturity value of $5,000,000 on March 15, 1954; of a loan by the Seaboard Investment Corporation to Mrs. Broome for the purpose of financing the purchase of the Treasury notes by Mrs. Broome from Livingstone & Company; and of a short sale by the Seaboard Investment Corporation to Livingstone & Company of similar U. S. Treasury notes in the face amount of $5,000,000, to procure fmids for the loan to Mrs. Broome. However, the crucial question is whether the transaction under scrutiny was in reality what it appeared to be in form. Johnson v. Commissioner of Internal Revenue, 86 F. 2d 710, 712 (C. A. 2, 1936).
In reality, this financial round robin was only a paper transaction that did not involve any real Treasury notes or any real money. No Treasury notes were actually delivered by Livingstone & Company to Mrs. Broome, or to the Seaboard Investment Corporation for her benefit; no pay *300 ment was actually made to Livingstone & Company by Mrs. Broome, or by the Seaboard Investment Corporation on her behalf, for the Treasury notes purportedly purchased by Mrs. Broome from Livingstone & Company; no payment was actually made by Livingstone & Company to the Seaboard Investment Corporation in connection with the purported short sale of U. S. Treasury notes by Seaboard to Livingstone & Company; and no funds were actually advanced or paid by Seaboard to Mrs. Broome, or to Livingstone & Company on her behalf, under the purported loan from Seaboard to Mrs. Broome.
It is true that actual checks in the amounts of $16,500, $20,000, and $56,844.02 were subsequently signed by Mrs. Broome and transmitted to the Seaboard Investment Corporation in the guise of interest payments on the purported loan previously mentioned. However, since no loan had actually been made by Seaboard to Mrs. Broome and Mrs. Broome was not actually indebted to Seaboard, her checks to Seaboard could not properly be regarded as interest payments on a nonexistent loan.
Section 23 (b) of the Internal Revenue Code of 1939 (26 U. S. C., 1952 ed., 23 (b)) allowed interest deductions for income tax purposes only with respect to “interest paid or accrued within the taxable year on indebtedness * * *” (emphasis supplied) ,[1] Therefore, since the remittances from Mrs. Broome to the Seaboard Investment Corporation did not rest upon any obligation, they were not deductible as interest payments for income tax purposes. Brown v. Commissioner of Internal Revenue, 241 F. 2d 827, 829-830 (C. A. 8, 1957).
Moreover, in each instance Mrs. Broome received from the Seaboard Investment Corporation, in exchange for her remittance, a check for the same amount as her purported payment (except that, for some reason not made plain by the evidence, she only received from Seaboard a $16,000 check in exchange for her remittance in the amount of $16,500).
*301 On the basis of all the evidence, it seems to be plain that the purpose of the Livingstone-Broome transaction pertaining to U. S. Treasury 1% percent notes of March 15, 1954 was to provide the semblance of interest payments for income tax purposes.
The Livingstone-Broome transaction pertaining to U. S. Treasury 1% percent notes of March 15, 1954 was merely one of many similar transactions which Mr. Livingstone consummated for his customers. One of the other persons involved in such a program was Eli D. Goodstein, of Fitch-burg, Massachusetts, whose dealings with Livingstone & Company and the Seaboard Investment Corporation were similar in all substantial respects to Mrs. Broome’s dealings with Livingstone & Company and Seaboard. The question whether remittances made by Mr. Goodstein to the Seaboard Investment Corporation in 1952 and 1953 as purported interest payments were properly deductible for income tax purposes was considered recently by the Tax Court in the case of Goodstein v. Commissioner of Internal Revenue. In a decision dated August 28, 1958 (30 T. C. 1178), the Tax Court said (at page 1188) that “all the steps taken were pursuant to a preconceived plan which lacked substance and which was entered into solely to form the basis for a claimed tax benefit”; and (at page 1190) that the transaction should be ignored for tax purposes.
I believe that the Tax Court’s decision in the Goodstein case was correct, and that it would be proper for this court to hold similarly in the present case that the Livingstone-Broome transaction pertaining to U. S. Treasury 1% percent notes of March 15, 1954 lacked substance and should be ignored for income tax purposes.
What has been said respecting the purported interest payments to the Seaboard Investment Corporation is equally applicable, in my opinion, to the purported interest payment in the amount of $30,870 by Mrs. Broome to the Corporate Finance and Loan Corporation in 1954. That remittance was part of the Livingstone-Broome transaction pertaining to U. S. Treasury 2y2 percent bonds of November 15, 1961, which took the form of a purported sale by Livingstone & Company to Mrs. Broome of such bonds in *302 the face amount of $350,000, of a purported loan by the Corporate Finance and Loan Corporation to Mrs. Broome of funds with which to finance the purchase of the bonds, and of a short sale of such bonds by the Corporate Finance and Loan Corporation to Livingstone & Company for the purpose of securing funds for the loan to Mrs. Broome. However, no U. S. Treasury bonds were actually delivered by Livingstone & Company to Mrs. Broome, or to the Corporate Finance and Loan Corporation for her benefit, pursuant to the purported sale; and no funds were actually advanced or paid by the Corporate Finance and Loan Corporation to Mrs. Broome, or to Livingstone & Company on her behalf, under the purported loan. This was merely a paper transaction, similar to the one previously discussed in connection with the XJ. S. Treasury 1% percent notes of March 15, 1954.
The bonds transaction can be differentiated to some extent from the notes transaction, on the basis that the promissory note which Mrs. Broome executed in connection with the purported purchase of the bonds did not contain a “no recourse” provision, whereas the promissory note which she executed in connection with the purported purchase of the notes did include such a provision, and that the $30,870 check which Mrs. Broome received in exchange for her purported interest payment in that amount to the Corporate Finance and Loan Corporation did not come directly from that company, but from the Court Finance and Loan Corporation, another member of the Livingstone bevy of nominal lending agencies. However, the controlling feature of the transaction pertaining to the XJ. S. Treasury %y2 percent bonds was that it did not involve a sale of actual bonds by Livingstone & Company to Mrs. Broome, or a loan of actual funds by the Corporate Finance and Loan Corporation to Mrs. Broome for the financing of such a purchase. Since Mrs. Broome was under no actual obligation to the Corporate Finance and Loan Corporation, her remittance to that company (for which she was reimbursed by another affiliated company) did not constitute a payment of interest.
For the reasons stated above, it is my opinion that the *303 plaintiffs are not entitled to recover, and that their petition should be dismissed.
BINDINGS OK FACT .

The Plaintiffs

1. The plaintiffs, Robert E. Broome and Mildred R. Broome, are husband and wife. They are citizens of the United States and residents of the State of New York.
2. During the period 1952-1954, the plaintiff Robert E. Broome was a senior vice president of the Guaranty Trust Company in New York City. He was in charge of the bank’s department which handled loans on securities.

M. Eli Livingstone

3. In the performance of his duties as an officer of the Guaranty Trust Company, Mr. Broome became acquainted in the spring of 1952 with M. Eli Livingstone, of Boston, Massachusetts. Mr. Livingstone was engaged in the securities business. The business was operated under the name of Livingstone & Company. In some transactions, Mr. Livingstone acted as a broker, and in others he acted as a principal.
4. As a result of conversations between Messrs. Broome and Livingstone, an arrangement was made whereby the Guaranty Trust Company became a clearance agent for Livingstone & Company with respect to securities transactions in New York City.
5. When a securities dealer establishes a clearance account with a bank, the latter handles for the dealer receipts and deliveries of securities, makes payments for securities that are received from third persons for the dealer, and receives payments for securities that are delivered on behalf of the dealer to third persons. The bank charges for its services a fee based upon the volume of the turnover.
6. In his business relations with bank officials (such as Mr. Broome of the Guaranty Trust Company), Mr. Livingstone endeavored to develop goodwill for himself by accommodating the officials whenever an opportunity to do so arose.
7. In 1952, Mr. Livingstone was handling for his customers a large number of transactions pertaining to U. S. Treasury *304 1% percent notes that were due to mature on March 15, 1954. Such transactions were arranged in the light of advice which Mr. Livingstone had received from the Bureau of Internal Eevenue in two exchanges of correspondence with that agency.
8. (a) The first exchange of correspondence referred to in finding 7 consisted of a letter dated June 5, 1952 from Mr. Livingstone to the Bureau of Internal Eevenue, and of a reply dated June 30, 1952 from the Bureau.
(b) Mr. Livingstone’s letter of June 5,1952 stated in part as follows:
I am a taxpayer situated in the City of Boston. In March of 1952 I purchased 3,000,000 U. S. Treasury iy2% notes due March 15,1955 which are fully taxable.
I made a small down payment against this purchase, and financed the balance with a finance company on a note which matures on December 29, 1952, without recourse against me personally at 2%%.
They took from me an option to purchase these bonds from me at 99%% which they can exercise on December 29.
During the interim I have the right to sell or liquidate my position, and stop interest on the note which I gave to them.
The finance company had sold similar bonds short. Under the terms of the note which I signed, they were given permission to pledge, hypothecate or otherwise use the securities while in their custody as collateral for my loan. They applied these bonds to cover the short position they had previously taken.
* * * $ *
Based upon the foregoing, I request rulings as follows :
(1) Is the interest which I pay to the finance company deductible from my taxable income?
* * % ❖ *
(c) The Bureau of Internal Eevenue, in a letter dated June 30, 1952, gave the following answer to the question quoted in paragraph (b) of this finding:
Section 23 (b) of the Internal Eevenue Code and the regulations promulgated thereunder provide in part that interest paid or accrued within the year on indebtedness incurred or continued to purchase or carry obligations *305 of the United States issued after September 24, 1917, the interest upon which is not wholly tax exempt, is deductible from gross income.
9. (a) The second exchange of correspondence referred to in finding 7 consisted of a letter dated September 2, 1952 which Mr. Livingstone wrote to the Bureau of Internal Kev-enue in the name of his wife, Louise F. Livingstone, and of a reply dated September 26, 1952 from the Bureau.
(b) The letter which Mr. Livingstone wrote in his wife’s ¡name on September 2, 1952 was as follows:
On July 24,1952,1 purchased $5,000,000 U. S. Treasury 1%% Notes due March 15, 1954 at 98[2]%2. Lmade a small down payment and borrowed the difference from a finance company, which is not controlled by_ my family, at 2i/4% interest on a nonrecourse note which matures on March 15,1954.
The note further provides that I may at any time anticipate payment of any or all of the principal amount owed; upon such anticipation interest shall be computed at the rate of 14 of 1% from such prepayment date to the maturity date of the note; that no recourse shall be had against me except to the extent of the proceeds realized from the sale or liquidation of the collateral held as security.
I intend to pay to the finance company before October 30th $25,000 which is to be applied as payment of interest by me. Thereafter, the finance company has agreed to loan me $25,000.00 additional, this loan to be supported by collateral already held by them.
The finance company sold a similar block of notes short and, with my expressed permission, applied the notes which I purchased to cover their short position.
At the time of purchase, I paid 98[2]%2 for these notes. It is my intention to hold these until they have matured, at 100, or until they have shown substantial improvement in price.
I now request a ruling as follows:
(1) Is the interest which I paid to the finance company deductible from my taxable income in the year in which it is paid ?
(2) Will the gain realized from the sale of these notes be treated as a long-term capital gain, provided that they had been held in excess of six months?
(3) Does the no recourse provision in the note affect the deductibility of the interest paid by me from my taxable income?
*306 (4) Does the short sale which the finance company made for its own account affect my right to deduct interest which I pay to them ?
(5) Assuming that at the time that I liquidate these notes, the interest cost equals or exceeds the amount of capital gain which accrues in my favor, does that affect my right to deduct the interest, and to treat the appreciation as long-term capital gain, provided that I have held these notes for a period in excess of six months ?
(6) Does the short sale which the finance company made for its own account affect my right to treat the appreciation in value, if any, as long-term capital gain, assuming I have held these notes for a period exceeding six months ?
I would appreciate the expediting of this ruling as it bears upon the conduct of my business affairs for the balance of this year.
(c) The reply dated September 26,1952 from the Bureau of Internal Revenue to the communication quoted in paragraph (b) of this finding answered the inquiries as indicated below:
(1) Is the interest which I paid to the finance company deductible from my taxable income in the year in which it is paid ?
Answer: Interest paid to the finance company will constitute an allowable deduction from gross income under section 23 (b) of the Internal Revenue Code in the year paid.
(2) Will the gain realized from the sale of these notes be treated as a long-term capital gain, provided that they had been held in excess of six months ?
Answer: Yes, if you are not a dealer in securities.
(3) Does the no recourse provision in the note affect the deductibility of the interest paid by me from my taxable income?
Answer: The “no recourse” provision in the note will not affect the deductibility of the interest paid.
(4) Does the short sale which the finance company made for its own account affect my right to deduct interest which I pay to them ?
Answer: The short sale made by the finance company will not affect your right to deduct interest paid.
(5) Assuming that at the time that I liquidate these notes, the interest costs [sic] equals or exceeds the amount of capital gain which accrues in my favor, does *307 ■that affect my right to deduct the interest, and to treat the appreciation as long-term capital gain, provided that I have held these notes for a period in excess of six months ?
Answer: The fact that the interest equals or exceeds the amount of the capital gain on the notes will not affect the interest deduction or the treatment of the gain as long-term capital gain if held for more than six months.
(6) Does the short sale which the finance company made for its own account affect my right to treat the appreciation in value, if any, as long-term capital gain, assuming I have held these notes for a period exceeding six months?
Answer: No.
10. Mr. Livingstone prepared copies of the communications from the Bureau of Internal Bevenue referred-to in findings 8 (c) and 9 (c), furnished such copies to customers, and pointed out to them the tax advantages that might reasonably be expected to result, in the light of the Bureau’s statements, from transactions involving U. S. Treasury' 1% percent notes of March 15, 1954. Numerous transactions pertaining to such notes were consummated by Mr. Livingstone for the benefit of his customers after receiving the communications from the Bureau of Internal Bevenue.
11. (a) In connection with the transactions mentioned in finding 10, Mr. Livingstone utilized (among other institutions) the Seaboard Investment Corporation, of Boston, Massachusetts. This corporation was organized in the summer of 1952 with a capital stock, as shown on its books, of $700. The capital stock was not paid for until March 10, 1953.
(b) The Seaboard Investment Corporation started business with a loan of $2,250 from Mr. Livingstone on July 25, 1952. Its operations were thereafter conducted with a comparatively small supply of money.
(c) A brother of Mr. Livingstone was the president of the Seaboard Investment Corporation.
(d) The Seaboard Investment Corporation’s sole business was to perform the role of a lending agency for Mr. Livingstone’s customers in connection with transactions pertaining to U. S. Treasury 1% percent notes of March 15, *308 1954. The corporation became inactive after March 15, 1954.

Broome-Living stone Transaction Pertaining to U. S. Treasury Notes

12. (a) During the course of conversations between Messrs. Broome and Livingstone in September or early in October 1952, they discussed the possibility of Mr. Broome’s realizing tax advantages from a transaction pertaining to U. S. Treasury 1% percent notes of March 15,1954, similar to the transactions which Mr. Livingstone was handling for other persons in connection with such notes. Mr. Livingstone made available to Mr. Broome copies of the letters from the Bureau of Internal Revenue referred to in findings 8 (c) and 9 (c). In addition, Mr. Livingstone assured Mr. Broome that it would not be necessary for the latter to provide any financing for such a transaction. As a result of the discussion, Mr. Broome decided to embark upon such a transaction and to proceed in the name of his wife, since it would have been necessary for him to obtain the approval of the board of directors of the Guaranty Trust Company if his own name had been used.
(b) Mrs. Broome’s personal participation in the events related hereafter with respect to U. S. Treasury 1% percent notes of March 15, 1954 was limited to signing documents when requested to do so by her husband.
(c) The details of the program agreed upon by Messrs. Broome and Livingstone are indicated in subsequent findings.
13. On October 6, 1952, in accordance with the program agreed upon by Messrs. Livingstone and Broome, Livingstone & Company issued to Mrs. Broome a memorandum stating that “As principal we have sold to you from inventory,” a,t a price of 99%2, U. S. Treasury 1% percent notes of March 15, 1954 having a maturity value of $5,000,-000. The total price was given as $4,955,930.60, consisting of $4,951,562.50 principal plus accrued interest of $4,368.10. The “payable date” was given as October 8, 1952.
14. The price of 99%2 mentioned in finding 13 was not out of line with the fair market value of U. S. Treasury 1% percent notes of March 15, 1954 in October 1952.
*309 15. On October 6, 1952, Livingstone & Company issued to the Seaboard Investment Corporation a memorandum stating that “As principal we have bought of you for inventory,” at a price of 99y64, U. S. Treasury 1% percent notes of March 15, 1954 having a maturity value of $5,000,000. The total price was given as $4,955,149.35, consisting of $4,950,781.25 principal plus accrued interest of $4,368.10. The “payable date” was given as October 8, 1952.
16. (a) On October 8, 1952, Mrs. Broome executed the following instrument, which was delivered to the Seaboard Investment Corporation:
On March 15, 1954,1 promise to pay to the Seaboard Investment Corp., a Massachusetts corporation at its principal office in Boston, Mass., (hereinafter referred to as the obligee) the sum of—
EOUR MILLION NINE HUNDRED EIFTY-FOUR THOUSAND EIGHT HUNDRED NINETY-NINE AND 35/ToO DOLLARS
together with interest on unpaid balances at the rate of 2%% per annum, subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral:
$5,000,000 U. S. Treasury 1%% Notes of 3/15/54
The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder.
The undersigned shall not be called upon nor be liable to furnish additional collateral to the obligee at any time.
The undersigned may anticipate payment, in whole or in part, at any time, of the amount due hereunder, and pbn.ll receive back a pro rated portion of the collateral so held.
All payments received by the obligee directly from or indirectly for the account of the undersigned shall be applied first to payment of interest and any balance thereof applied to payment of principal due hereunder as the obligor shall elect.
*310 The undersigned shall not in any event be personally liable to pay any of the principal indebtedness hereof or interest arising hereunder except from the proceeds from the sale of the collateral deposited. Application of the proceeds from the sale of the collateral by the obligee shall be a full accord and satisfaction of any and all claims hereunder and act as a full and complete discharge of any and all liability of the undersigned.
This note has been entered into in the City of Boston, Massachusetts and shall be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts.
(b) The evidence does not show why the amount of the obligation set out in the instrument mentioned in paragraph (a) of this finding was $1,031.25 less than the purchase price of the U. S. Treasury notes referred to in finding 13. This difference was not paid to Livingstone & Company by Mrs. Bi'oome or by anyone else on her behalf.
17. On November 10, 1952, Mrs. Broome signed a letter which was addressed to the Seaboard Investment Corporation and which stated as follows:
You are hereby instructed to receive from Livingstone & Company $5,000,000 U. S. Treasury 1%% Notes of 3/15/54, against payment to them of the proceeds of my loan with you.
Will you please arrange to give to them appropriate instructions regarding the delivery and payment for •these bonds, which you will then hold as collateral to my loan. For my records, will you please advise me the numbers of the bonds received.
18. Entries were made in the books of the Seaboard Investment Corporation to indicate that the corporation had received $4,955,149.35 from a short sale of securities to Livingstone & Company, and had made a loan to Mrs. Broome in the amount of $4,954,899.35.
19. (a) No Treasury notes were actually delivered by Livingstone & Company to Mrs. Broome, or to the Seaboard Investment Corporation for her benefit, pursuant to the instruments mentioned in findings 13, 16, and 17.
(b) No payment was actually made to Livingstone & Company by Mrs. Broome, or by the Seaboard Investment Corporation on her behalf, for the Treasury notes mentioned in findings 13, 16, and 17.
*311 (c) No payment was actually made by Livingstone & Company to the Seaboard Investment Corporation for tbe Treasury notes mentioned in finding 15.
(d) No funds were actually advanced or paid by tbe Seaboard Investment Corporation to Mrs. Broome, or to Livingstone & Company on ber bebalf, by virtue of tbe instruments mentioned in findings 16 and 17.
20. There is in the record tbe following evidence with respect to a transaction involving actual Treasury notes and actual funds at about tbe time of tbe incidents mentioned in findings 13-17:
(a) On October 6, 1952, Livingstone & Company issued to Aubrey G. Lanston & Co., Inc., a dealer in securities with an office in New York City, a memorandum stating that “As principal we have bought of you,” at a price of 99i/32, U. S. Treasury 1% percent notes of March 15, 1954 having a maturity value of $5,000,000. Tbe total price was given as $4,955,930.60, consisting of $4,951,562.50 principal plus accrued interest of $4,368.10. Tbe “payable date” was given as October 8, 1952. Tbe sale of these Treasury notes by Aubrey G. Lanston & Co., Inc., to Livingstone & Company was confirmed in a memorandum which the former addressed to tbe latter under tbe date of October 6, 1952.
(b) In a letter dated October 6, 1952 from Livingstone & Company to tbe Guaranty Trust Company, tbe former stated (among other things) that “You are hereby instructed to receive from Aubrey G. Lanston & Co., Inc. $5,000,000 U. S. Treasury 1% of 3/15/54 against payment of $4,955,930.60.”
(c) On October 6, 1952, Livingstone & Company issued to Aubrey G. Lanston & Co., Inc., a memorandum stating that “As principal we have sold to you from inventory,” at 99%4, TJ. S. Treasury 1% percent notes of March 15, 1954 having a maturity value of $5,000,000. The total price was given as $4,955,149.35, consisting of $4,950,781.25 principal together with accrued interest in the amount of $4,368.10. The “payable date” was given as October 8, 1952.
(d) In a letter dated October 6, 1952 from Livingstone & Company to the Guaranty Trust Company, the former stated that “You are hereby instructed to deliver to Aubrey *312 G. Lanston & Co., Inc. from my account $5,000,000 U. S. Treasury 1% of 3/15/54 against receipt of $4,955,149.35.”
(e) On October 8, 1952, pursuant to the communications, referred to in paragraphs ('a) and (b) of this finding,, Aubrey G. Lanston & Co., Inc. (through its clearance agent),. delivered five U. S. Treasury 1% percent notes of March 15, 1954 to the Guaranty Trust Company for the account of Livingstone & Company. The Treasury notes were in denominations of $1,000,000 each. The Guaranty Trust Company, in turn, delivered to the agent of Aubrey G. Lanston & Co., Inc., a check in the amount of $4,955,930.60, and charged this amount to the account of Livingstone &. Company.
(f) After the completion of the actions referred to in-paragraph (e) of this finding, the Guaranty Trust Company on the same day (October 8, 1952), pursuant to the-communications referred to in paragraphs (c) and (d) of this finding, returned the five Treasury notes to the agent of Aubrey G. Lanston & Co., Inc., and received from such-agent a check in -the amount of $4,955,149.35. This amount was credited by the Guaranty Trust Company to the account of Livingstone & Company.
(g) It is reasonable to infer that the purpose of the delivery and return of the Treasury notes, and the exchange of the checks, referred to in this finding was to provide for Livingstone & Company the appearance of being able to make delivery of the U. S. Treasury 1% percent notes involved in the purported sale to Mrs. Broome.
(h) As a result of the actions referred to in this finding,, Livingstone & Company’s account with the Guaranty Trust Company was reduced by $781.25, which amount was-charged to the Seaboard Investment Corporation on the-books of Livingstone & Company.
21. (a) On or about November 25, 1952, Mrs. Broome signed, and there was transmitted to the Seaboard Investment Corporation, a check in the amount of $16,500.
(b) On or about November 28,1952, Mrs. Broome signed,, and there was transmitted to the Seaboard Investment Corporation, an instrument stating as follows:
*313 On March 15,1954,1 promise to pay to Seaboard Investment Corp. the sum of—
-Sixteen thousand and no/100-
receipt of which is hereby acknowledged upon the same terms and conditions and subject to the same limitation of personal responsibility as my note to Seaboard Investment Corp. dated October 8, 1952 and upon the collateral previously delivered to Seaboard Investment Corp. and the terms of said note are hereby incorporated by reference.
(c) On November 28,1952, the Seaboard Investment Corporation issued to Mrs. Broome a check in the amount of •$16,000.
(d) With respect to the incidents mentioned in this finding, entries were made in the books of the Seaboard Investment Corporation to indicate the receipt of an interest payment in the amount of $16,500 from Mrs. Broome, and the making of an additional loan to Mrs. Broome in the amount •of $16,000.
22. In communications which the Bureau of Internal Revenue addressed to Mr. and Mrs. Livingstone separately on December 19, 1952, the letters of the Bureau referred to in findings 8 (c) and 9 (c) were withdrawn on the ground that “* * * the facts are not entirely clear as to the payment of interest and the realities of the transactions[2] in connection with the purchase and sale of the Notes * *
23. On March 15, 1953, semiannual interest coupons became due on 17. S. Treasury 1% percent notes of March 15, 1954. Although neither Mrs. Broome nor the Seaboard Investment Corporation held any such Treasury notes or cashed any such coupons, Seaboard credited Mrs. Broome’s account with the amount of $4,368.10 as a payment of principal and with $30,006.90 as a payment of interest.
24. On September 15, 1953, semiannual interest coupons .became due on U. S. Treasury 1% percent notes of March 15, 1954. Although neither Mrs. Broome nor the Seaboard Investment Corporation held any such Treasury notes or cashed any such coupons, Seaboard credited Mrs. Broome’s account with $34,375 as a payment of interest.
*314 25. (a) On or about October 20,1958, Mrs. Broome signed, and there was transmitted to the Seaboard Investment 'Corporation, a check in the amount of $20,000.
(b) On or about October 23, 1953, Mrs. Broome signed, and there was transmitted to the Seaboard Investment Corporation, an instrument stating as follows:
On March 15, 1954, I promise to pay to Seaboard Investment Corp., the sum of—
TWENTY THOUSAND AND NO/lOO DOLLARS
receipt of which is hereby acknowledged upon the same terms and conditions and subject to the same limitation of personal responsibility as my note to Seaboard Investment Corp., dated October 8,1952, and upon the collateral previously delivered to Seaboard Investment Corp., and the terms of said note are hereby incorporated by reference.
(c) On October 23, 1953, the Seaboard Investment Corporation issued to Mrs. Broome a check in the amount of $20,000.
(d) With respect to the incidents mentioned in this finding, entries were made in the books of the Seaboard Investment Corporation to indicate the receipt of an interest payment in the amount of $20,000 from Mrs. Broome, and the making of an additional loan to Mrs. Broome in the amount of $20,000.
28. (a) On or about February 1,1954, Mrs. Broome signed, and there was transmitted to the Phelps Memorial Hospital in North Tarrytown, New York, a letter which stated in part as follows:
I take great pleasure in making a gift to you of $5,000,000 U. S. Treasury Notes 1%%, due March 15, 1954, subject to my obligation to Seaboard Investment Corporation in the principal amount of $5,043,375.27, against which such Treasury Notes are held by them as collateral.
(b) On or about February 1, 1954, Mrs. Broome signed, and there was transmitted to the Seaboard Investment Corporation, a letter which stated as follows:
Please be advised that I have this day made a gift to Phelps Memorial Hospital, North Tarrytown, New York, of the $5,000,000 U. S. Treasury Notes 1%%, *315 due March 15,1954, which you hold as collateral against my notes.
27. (a) On or about February 2,1954, Mrs. Broome signed, and there was transmitted to the Seaboard Investment Corporation, a check in the amount of $56,844.02.
(b) On or about February 3, 1954, Mrs. Broome signed, and there was transmitted to the Seaboard Investment Corporation, an instrument stating as follows:
On March 15, 1954, I promise to pay to Seaboard Investment Corp. the sum of—
FIFTY-SIX THOTTSAND EIGHT HUNDRED FORTY-FOUR AND 02/100 DOLLARS
receipt of which is hereby acknowledged upon the same terms and conditions and subject to the same limitation of personal responsibility as my note to Seaboard Investment Corp., dated October 8, 1952, and upon the collateral previously delivered to Seaboard Investment Corp., and the terms of the said note are hereby incorporated by reference.
(c) On February 3, 1954, the Seaboard Investment Corporation issued to Mrs. Broome its check in the amount of $56,844.02.
(d) With respect to the incidents mentioned in this finding, entries were made in the books of the Seaboard Investment Corporation to indicate the receipt of an interest payment in the amount of $56,844.02 from Mrs. Broome, and the making of an additional loan to Mrs. Broome in the amount of $56,844.02.
28. Under the date of February 3, 1954, Livingstone & Company issued to the Seaboard Investment Corporation a memorandum stating that “As agent for another we have sold to you,” at a price of 1002%4, U. S. Treasury 1% percent notes of March 15, 1954 having a maturity value of $5,000,000. The total price was given as $5,044,747.07, consisting of $5,017,968.75 principal plus 'accrued interest of $26,778.32.
29. Under the date of February 3, 1954, Livingstone & Company issued to the Phelps Memorial Hospital a memorandum stating that “As your agent we have sold for your account,” at 1002%4, U. S. Treasury 1% percent notes of *316 March 15, 1954 having a maturity value of $5,000,000. The total price was given as $5,044,397.07, consisting of $5,017,-968.75 principal plus accrued interest of $26,778.32, less a commission in the amount of $350.
30. The price of 1002%4 mentioned in findings 28 and 29 was not out of line with the fair market value of U. S. Treasury 1% percent notes of March 15, 1954 in February 1954.
31. No Treasury notes were actually conveyed as a result of the documents referred to in findings 28 and 29.
32. Under the date of February 12, 1954, Livingstone & Company transmitted to the Phelps Memorial Hospital a check in the amount of $1,021.80. This amount was the equivalent of the equity shown in favor of Mrs. Broome at the time on the books of the Seaboard Investment Corporation, less $350. In computing such equity, Mrs. Broome’s account was credited with accrued interest on U. S. Treasury 1% percent notes of March 15,1954 having a maturity value of $5,000,000.
33. The net cost to Mrs. Broome of the various actions referred to in findings 13-32 amounted to $500. This represented the difference between the amounts of the checks mentioned in finding 21 as having been exchanged between Mrs. Broome and the Seaboard Investment Corporation in November 1952. The reason for such discrepancy is not disclosed by the evidence.

Broome-Living stone Transaction Pertaining to U. JS. Treasury Bonds

34. (a) In December 1954, Messrs. Broome and Livingstone embarked upon a transaction pertaining to U. S. Treasury 2% percent bonds of November 15, 1961. Mr. Broome acted under his wife’s name in order to avoid the necessity of securing the approval of the board of directors of the Guaranty Trust Company.
(b) Mrs. Broome’s personal participation in the activities mentioned in subsequent findings with respect to U. S. Treasury 2% percent bonds of November 15, 1961 was limited to the signing of documents when requested to do so by her husband.
*317 35. On December 21,1954, Livingstone & Company issued to Mrs. Broome a memorandum stating that “As principal and for our own account we have sold to you,” at a price of 981/32, U. S. Treasury 2% percent bonds of November 15, 1961 having a maturity value of $350,000, “with 5/15/55 and 11/15/55 coupons detached.” The total price was given as $343,109.38.
36. (a) In a letter signed by Mrs. Broome on December 21, 1954 and addressed to Livingstone & Company, the latter was instructed to deliver to the Corporate Finance and Loan Corporation in Boston, Massachusetts, for Mrs. Broome’s account, “$350,000 U. S. Treasury 2l^% Bonds of November 15, 1961 with 5/15/55 and 11/15/55 coupons detached against payment of $343,000.00.”
(b) The Corporate Finance and Loan Corporation was (like the Seaboard Investment Corporation) an institution utilized by Mr. Livingstone to perform the role of a lending agency in connection with securities transactions arranged for his customers.
37. (a) In a letter signed by Mrs. Broome on December 21, 1954, the Corporate Finance and Loan Corporation was requested to receive from Livingstone & Company, for Mrs. Broome’s account, “$350,000 U. S. Treasury 2%% Bonds of November 15, 1961 with 5/15/55 and 11/15/55 coupons detached against payment to them of $343,000.00.”
(b) Enclosed with the communication referred to in paragraph (a) of this finding was an instrument signed by Mrs. Broome under the date of December 21, 1954 and stating as follows:
On December 21, 1958, I promise to pay to the Corporate Finance 'and Loan Corp., a Massachusetts corporation at its principal office in Boston, Massachusetts (hereinafter referred to as the obligee) the sum of
THREE HUNDRED AND FORTY-THREE THOUSAND AND NO/lOO DOLLARS
Interest through December 21, 1958 in the amount of $30,870.00 having been prepaid by me; subject to the following, rights and conditions, having deposited with the said obligee the following securities as collateral:
*318 $350,000 U. S. Treasury 2y2% Bonds of November 15, 1961 with 5/15/55 and 11/15/55 coupons detached
The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the amount due hereunder.
In the event of liquidation of the securities securing this note on November 15, 1955, November 15, 1956 or November 15, 1957 interest shall continue to run in favor of the payee to December 21 of the year in which it is terminated, in any event, the collateral held shall be liquidated on November 15, 1958, and there shall be no return of interest thereafter.
This note has been entered into in the City of New York and shall be construed and interpreted in accordance with the laws of the State of New York.
(c) The evidence does not show why the principal amount of the obligation set out in paragraph (b) of this finding was $109.88 less than the price of the U. S. Treasury bonds mentioned in finding 35.
38. With respect to the matters mentioned in findings 35-37, entries were made in the books of the Corporate Finance and Loan Corporation to indicate the receipt of $343,109.38 representing the proceeds from a short sale of securities to Livingstone & Company, and the making of a loan in the amount of $343,000 to Mrs. Broome.
39. (a) No U. S. Treasury bonds were actually delivered by Livingstone & Company to Mrs. Broome, or to the Corporate Finance and Loan Corporation for her benefit, pursuant to the instruments mentioned in findings 35-37.
(b) No payment was actually made to Livingstone & Company by Mrs. Broome, or by the Corporate Finance and Loan Corporation on her behalf, for the U. S. Treasury bonds mentioned in findings 35-37.
(c) No funds were actually advanced or paid by the Corporate Finance and Loan Corporation to Mrs. Broome, or *319 to Livingstone & Company on her behalf, by virtue of the instruments mentioned in findings 35-37.
(d) No payment was actually made by Livingstone & Company to the Corporate Finance and Loan Corporation by virtue of the short sale of securities mentioned in finding 38.
40. (a) Under the date of December 21,1954, Mrs. Broome signed, and there was transmitted to the Court Finance and Loan Corporation in Boston, Massachusetts, an instrument stating as follows:
On or before December 21, 1955, I promise to pay to the Court of Finance and Loan Corp., a Massachusetts corporation having its principal office at 1 Court Street, Boston, Massachusetts, (hereinafter referred to as the obligee) the sum of
THIRTY THOUSAND EIGHT HUNDRED AND SEVENTY AND NO/lOO DOLLARS
together with interest at the rate of 3% payable annually.
To secure payment of this obligation the undersigned gives to the obligee a lien against
$350,000 U. S. Treasury Bonds of November 15, 1961 with 5/15/55 and 11/15/55 coupons detached which are currently held by the Corporate Finance and Loan Corp. of Boston as security for a loan owed to them by the undersigned. This lien is subject to the rights of the said Corporate Finance and Loan Corp. in the said collateral.
(b) The Court Finance and Loan Corporation was (like the Seaboard Investment Corporation and the Corporate Finance and Loan Corporation) an institution utilized by Mr. Livingstone to perform the role of a lending agency in connection with securities transactions arranged for his customers.
(c) On December 21, 1954, the Court Finance and Loan Corporation issued to Mrs. Broome a check in the amount of $30,870.
(d) On December 23, 1954, Mrs. Broome signed, and there was transmitted to the Corporate Finance and Loan Corporation, a check in the amount of $30,870.
*320 (e) With, respect to the incidents mentioned in this finding, an entry was made in the books of the Court Finance- and Loan Corporation to indicate the making of a loan in the amount of $30,870 to Mrs. Broome, and an entry was. made in the books of the Corporate Finance and Loan Corporation to indicate the receipt of interest in the amount of $30,870 from Mrs. Broome.
41. On December 28, 1954, Mr. Broome issued his check in the amount of $109.38 to Livingstone & Company.
42. (a) Under the date of November 15, 1955, Livingstone- & Company issued to Mrs. Broome a memorandum stating that “As principal and for our own account we have bought of you,” at 98%, U. S. Treasury 2% percent bonds of November 15, 1961 having a maturity value of $350,000. The total price was given as $343,437.50.
(b) The books of Livingstone & Company contain entries under the date of November 15, 1955 showing that the purported purchase of bonds from Mrs. Broome mentioned in paragraph (a) of this finding was set off against a purported sale of bonds to the Corporate Finance and Loan Corporation. Corresponding entries were made in Corporate’s books.
(c) No U. S. Treasury 2% percent bonds of November 15, 1961 were actually conveyed by virtue of the actions referred to in this finding.

Administrative Proceedings

43. For the calendar year 1952, the plaintiffs filed with the District Director of Internal Revenue, Lower Manhattan District, New York, New York, a joint Federal income tax return which showed income and expenses on a cash basis. In this return, the plaintiffs claimed a deduction in the amount of $16,500 as an interest payment to the Seaboard Investment -Corporation (see finding 21).
44. For the calendar year 1953, the plaintiffs filed with the District Director of Internal Revenue, Lower Manhattan District, New York, New York, a joint Federal income tax return which showed income and expenses on a cash basis. In this return, the plaintiffs claimed a deduction in the *321 amount of $20,000 as a payment of interest to the Seaboard Investment Corporation (see finding 25).
45. For the calendar year 1954, the plaintiffs filed with the District Director of Internal Revenue, Lower Manhattan District, New York, New York, a joint Federal income tax return which showed income and expenses on a cash basis. In this return, the plaintiffs claimed a deduction in the amount of $56,844.02 as interest paid to the Seaboard Investment Corporation (see finding 27), a deduction in the amount of $30,870 as interest paid to the Corporate Finance and Loan Corporation (see finding 40), and a deduction in the amount of $1,021.80 as a charitable contribution to the Phelps Memorial Hospital (see findings 26, 28, 29, and 32).
46. (a) Following an audit of the plaintiffs’ Federal income tax return for 1952, a deficiency in the amount of $6,-268, together with interest in the amount of $801.01, was assessed against the plaintiffs by the Internal Revenue Service on the ground that the claimed interest payment of $16,-500 was not deductible.
(b) On or about November 17, 1955, the plaintiffs paid to the District Director of Internal Revenue, Lower Manhattan District, New York, New York, the deficiency of $6,268 and the interest of $801.01 referred to in paragraph (a) of this finding.
47. (a) Following an audit of the plaintiffs’ Federal income tax return for 1953, the Internal Revenue Service assessed against the plaintiffs a deficiency of $8,992.76, together with interest in the amount of $879.44, on the ground that the claimed interest payment of $20,000 was not deductible.
(b) On or about November 17,1955, the plaintiffs paid to the District Director of Internal Revenue, Lower Manhattan District, New York, New York, the deficiency and interest referred to in paragraph (a) of this finding.
48. (a) Following an audit of the plaintiffs’ income tax return for 1954, the Internal Revenue Service assessed against the plaintiffs a deficiency of $18,948.56, together with interest in the amount of $584.03, on the ground that the claimed interest payments of $56,844.02 and $30,870 were not deductible.
*322 (b)On or about November 17,1955, the plaintiffs paid to the District Director of Internal [Revenue, Lower Manhattan District, New York, New York, the deficiency and interest mentioned in paragraph (a) of this finding.
49. (a) On or about November 21, 1955, and within the time allowed by law, the plaintiffs duly executed and filed with the District Director of Internal Revenue, Lower Manhattan District, New York, New York, a claim for the refund of the $6,268 and the $801.01 referred to in finding 46.
(b) On or about November 21, 1955, and within the time allowed by law, the plaintiffs duly executed and filed with the District Director of Internal Revenue, Lower Manhattan District, New York, New York, a claim for the refund of the $8,992.76 and the $879.44 referred to in finding 47.
(c) On or about November 21, 1955, and within the time allowed by law, the plaintiffs duly executed and filed with the District Director of Internal Revenue, Lower Manhattan District, New York, New York, a claim for the refund of the $18,948.56 and the $584.03 referred to in finding 48.
(d) None of the claims referred to in this finding has been allowed or paid by the defendant in whole or in part.
50. The plaintiffs are the sole owners of the claims presented in this litigation.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and their petition is therefore dismissed.

 The Internal Revenue Code of X9S4 contains a similar provision. (26 U. S. C., 1952 ed., Supp. V, 163 (a).)

 The singular, “transaction,” was used in the letter to Mrs. Livingstone.