Frederick Von Hessert and Hertha Von Hessert v. Commissioner. Fairmount Chemical Co., Inc. v. Commissioner.
Von Hessert v. Commissioner
Docket Nos. 72026, 72027.
United States Tax Court
T.C. Memo 1961-226; 1961 Tax Ct. Memo LEXIS 122; 20 T.C.M. (CCH) 1119; T.C.M. (RIA) 61226; August 14, 1961
*122 The corporate petitioner expended funds in the purchase of a yacht, title to which was taken by the individual petitioner who was its principal stockholder and who used it for both his personal purposes and for entertaining for the benefit of the corporation. The corporation also paid amounts for operation of, and insurance on, the yacht. Held, that the individual petitioner was in receipt of a taxable dividend in the amount of the cost of the yacht; that the corporation is not entitled to deduct depreciation on the yacht; that the amounts expended by the corporation for operation of the yacht, and insurance premium thereon, are deductible by the corporation in the proportion of the business use of the yacht to its total use, and that the remainder of such expenditures constitute taxable dividends to the individual petitioner. Harry L. Brown, Esq., for the petitioners. Clarence P. Brazill, Jr., Esq., and Robert C. Duffey, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1951 and 1952 as follows: Petitioner
Year
Deficiency
Frederick and Hertha Von
Hessert
1951
$2,124.78
1952
9,664.30
Fairmount Chemical Com-
pany, Inc.
1952
9,805.63
Some of the issues raised in the petitions and amendments thereto have been settled by concessions or agreements by the parties as follows: it has been agreed that as a result of liquor furnished and weekly payments made by Fairmount Chemical Company in 1951 to the individual petitioners and claimed to have been for entertainment on behalf of the corporation, *124 the individuals were in receipt of taxable income to the extent of $1,010.62, thus disposing of the only issue raised for that year; that the income received by the individual petitioners for the year 1952 from this source amounted to $1,024.50; that the individuals did not have any capital gain upon the sale of the yacht Quest I in 1952; and that of the amount of $1,950 paid by Fairmount Chemical Company to a landscaping company in 1952, $1,430 is deductible and that the balance of $520 is to be capitalized as a part of the cost of construction of a plant. In its petition the corporation assigned as error the disallowance by the respondent of deductions claimed in the amount of $530.75 for reconditioning (including parts) of the yacht Quest II and miscellaneous yacht expenses of $1,136.20. However, by amended petition it abandoned its claim to those deductions and, in lieu thereof, made claim for the deduction of an amount of $1,107.73 as a casualty loss arising out of the operation of the Quest II and for a deduction of $622.07 on account of operation of the yacht. The respondent has conceded that there was a casualty loss in the amount of $1,107.73, and that either the corporation, *125 or the individuals, will be entitled to a deduction on account thereof, depending upon the decision as to the ownership of the yacht. The respondent has also conceded that the corporation expended $622.07 in connection with the operation of the yacht, without conceding that this amount is deductible. The remaining issues are whether the individual petitioners were in receipt of dividend income in 1952 on account of the purchase by the corporation of the yacht Quest II and the payment by the corporation of amounts for operation of, and insurance on, the yacht; if so, whether the individuals are entitled to deductions on account of the payments for operation and insurance; whether the corporation is entitled to deductions on account of such expenditures for operation and insurance; and whether the corporation is entitled to deduct depreciation on the yacht. Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. The petitioners, Frederick and Hertha Von Hessert, are husband and wife, residing at West Orange, New Jersey. They filed joint income tax returns for the taxable years 1951 and 1952 with the district director *126 of internal revenue at Newark, New Jersey. The petitioner, Fairmount Chemical Company, Inc., hereinafter referred to as the corporation, was organized in 1938 under the laws of the State of New Jersey. Its principal office is in New York City, and it has two chemical plants in New Jersey. It filed its income tax return for the taxable year 1952 with the director of internal revenue, Lower Manhattan, New York. In 1951 and 1952 Frederick Von Hessert owned 95.9 percent of its stock and Hertha Von Hessert owned 3.9 percent. The remaining 2/10 percent was owned equally by Alfred M. Lust and Calman J. Kish. Frederick Von Hessert will hereinafter be referred to as the petitioner. The petitioner attended school in Germany and graduated as a doctor of chemical engineering from the Institute of Technology, Berlin, Germany. Thereafter he came/to the United States and for a number of years worked as assistant superintendent of a chemical plant and as a consultant, prior to organization of the corporation. The petitioner was president and treasurer of the corporation, Kish was its vice president. Harry Schramm was secretary, and Hertha Von Hessert was assistant secretary. The directors were *127 the petitioner, Lust, and Kish. Lust is a certified public accountant whose firm audited the corporation's books. Kish was an employee of the corporation and supervised the technical end of the business. At the inception of the corporation the petitioner conducted the general management as well as the selling. In 1951 and 1952 he supervised the over-all operation and did all the selling. During 1952, and prior and subsequent thereto, the corporation engaged in the manufacture and sale of chemicals. About 1939 it began the production of hydrazine, which is used as a fuel in rockets, detonators, and power plants, and which is also used in manufacturing pharmaceuticals and agricultural and photographic chemicals. In 1940 the corporation obtained some defense business and under a certificate of necessity expanded its plant for the production of hydrazine for flares and detonators. Since 1940 about 50 percent of the production of the corporation has consisted of hydrazine. In 1950 and 1951 the petitioner, together with Kish, developed a new process for the production of hydrazine, and patents were issued on the process in 1957. The sales of the corporation increased over the period 1941 *128 to 1952 from $121,664.51 to $865,324.81. The corporation has never declared any dividends. In August 1951 the corporation entered into an agreement with Empire Trust Company of New York providing for an installment loan which was to be in an amount not in excess of $125,000, the proceeds to be used for construction of an additional building at the corporation's plant. Such loan was repayable in installments over the period from December 31, 1952 to December 31, 1956. The loan agreement provided, among other things, that the corporation should obtain a term insurance policy in its favor, insuring the life of petitioner in the amount of $100,000 and should assign the policy to the bank; that so long as any amount of the loan remained unpaid the corporation should monthly and yearly furnish to the bank balance sheets, profit and loss statements, and yearly audits; and that, except with prior written consent of the bank, the corporation would not permit its working capital to be less than $75,000, pay or declare any dividends, make or declare any other distributions on its capital stock, or increase the existing salary and bonus arrangements with its officers by more than 20 percent. *129 The corporation's customers, many of whom were chemical firms, were principally located in the area from Philadelphia to Connecticut. During 1951 and 1952 the corporation had numerous competitors who were able to supply products similar to those which it produced. The petitioner became interested in sailing boats after he finished school in Germany. Thereafter he owned a small boat on Lake Erie. In 1937 he purchased for his personal use a yacht, Quest I, which was a 32-foot sloop having sleeping accommodations for three or four persons. Starting about 1947 the petitioner used the Quest I, in part, for entertaining persons associated with the chemical industry or engaged in research, and others representing customers, or prospective customers of the corporation. In 1951 the Quest I was devoted about equally to business entertainment and to the personal use of the petitioner. It was not used at all in 1952, being laid up for repair and being offered for sale. It was sold on August 15, 1952. In the spring of 1952, the petitioner discussed with the other directors of the corporation, particularly Lust, the inadequacy of the Quest I for entertaining guests and the advisability of *130 acquiring a more comfortable boat which could be used for entertainment. Lust agreed that it would be beneficial to the corporation. The petitioner visited various yacht brokers and located a 36-foot yawl with a sleeping capacity of 6. On May 16, 1952, he made a down payment of $1,000 and on May 23 he paid the balance of $9,000 on the purchase price, each payment being made by check of the corporation. In addition, the corporation expended in 1952 an amount of $806.35, resulting in a stipulated cost of acquisition of the boat of $10,806.35. This boat was not primarily a racing boat, but it was equipped with a Genoa sail which is necessary for racing This boat had a useful life of 25 years. The yacht broker or dealer issued a receipt in the name of the corporation for the purchase price of $10,000 and for payment of an amount of $550 covering yard charges. At the petitioner's request the broker or dealer had the boat "registered" with the Coast Guard in his name. On June 2, 1952, the Coast Guard issued a "Certificate of Award of Number to an Undocumented Vessel," covering this boat. Therein it was listed by the name of "Quest II" and the petitioner was shown as the owner. As a part *131 of such certificate, there is attached a form of bill of sale which the owner named in the certificate is required to execute and deliver to any purchaser in the event of sale. The petitioner took out a policy of insurance on the Quest II under date of June 5, 1952, providing hull insurance and indemnity against property damage and loss of life and personal injury. Therein the petitioner was named as the person insured and it was provided that loss, if any, should be paid to the corporation. The total premium was $354.50, which was paid in 1952 by the corporation. The policy provided for a return of a percentage of the premium in the event of cancellation of the policy. In 1952 petitioner paid $191 as premium for insurance on Quest I. The books of the corporation contain an entry under date of May 23, 1952, showing the purchase of the boat for $10,000, and it was included in fixed assets on the books of the corporation. The balance sheet of the corporation as of December 31, 1952, lists the boat under fixed assets at a cost of $10,870. In 1952 the corporation credited its reserve for depreciation in the amount of $634.08, representing depreciation on the Quest II. The petitioner *132 took delivery of the Quest II on May 29, 1952, and took the boat to Long Island. He thereafter kept it at Maidstone boat yard in East Hampton, Long Island, which is about 120 miles from his home and about 110 miles from his office. It customarily took petitioner about three or four hours to reach the boat from his office and about four hours to reach it from his home. The boat was in operation in 1952 until it was returned to winter quarters on October 19. Between those dates the petitioner used the boat on about 24 days, generally on week ends, for entertaining representatives of firms which were customers or prospective customers of the corporation, persons who had business or financial information which the petitioner desired to obtain for the benefit of the corporation, and a representative of the bank from which the corporation had borrowed money. This entertainment was primarily for the purpose of securing or retaining business advantages for the corporation. On some of these occasions the families of such persons were aboard and the petitioner's wife was present on all occasions. During 1952 the petitioner also used the Quest II for his personal pleasure and entertainment. *133 He used the boat 7 days for his vacation and also used it for personal purposes on other week ends. On such occasions he was accompanied by his wife and his daughter and his daughter's friends. On some week ends the boat was not used at all. During 1952 none of the other employees of the corporation sailed or was entertained aboard the yacht. Commencing in 1953 the petitioner raced Quest II on overnight races about twice a year, taking along business friends. He entered the Tri-Sail races on various occasions and raced twice in the Stamford Yacht Club race and once in the City Island Yacht Club race. It takes a crew of at least two to operate the boat. The petitioner was able to operate it with the aid of his wife. The petitioner did not race Quest II in 1952. The corporation paid $622.07 in 1952 in connection with the operation of Quest II, in addition to paying the insurance premium of $354.50. In 1952 the Quest II was used 60 percent for business purposes of the corporation and 40 percent for the personal pleasure or entertainment of the petitioner. The petitioner did not pay the corporation for his personal use of the boat. In its return for the year 1952 the corporation *134 showed gross profit from sales of $169,831.95, net income of $51,646.91, and total income and excess profits tax due in the amount of $21,259.57. Therein it showed compensation paid to the petitioner in the amount of $20,000 and total compensation paid to Kish and Schramm in the amount of $25,880. On the balance sheet attached to the return, the corporation showed earned surplus and undivided profits as of the end of the year 1952 in the amount of $149,893.74. Its assets were listed at $470,468.78 and its liabilities at $220,575.04. In its return the corporation claimed depreciation on the yacht Quest II in the amount of $634.08, based upon a cost of $10,870 and a useful life of 10 years. In the notice of deficiency the respondent disallowed this claimed deduction, stating that the yacht was not property used in a trade or business within the meaning of section 23(1) of the Internal Revenue Code of 1939. It also claimed as a deduction the amount of $354.50, representing premium paid for insurance on the boat, and amounts paid for operation of the boat. These also were disallowed by the respondent, on the ground that they were not ordinary and necessary business expenses of the corporation. *135 In their joint income tax return for the taxable year 1952, the individual petitioners reported net income of $28,608.10. In the notice of deficiency the respondent increased the net income as reported by them to $46,686.15. Included in his adjustments was the addition of an amount of $10,870, representing the cost of the yacht Quest II, paid by the corporation; $1,666.95 which he held represented cost, paid by the corporation, of operation and equipment of the yachts Quest I and Quest II; and an amount of $545.50, representing insurance premiums on the two yachts. The respondent held that all of the foregoing items represented distributions by the corporation to the petitioners and constituted taxable income to them. The respondent also increased reported net long-term capital gain by the amount of $507.65 on account of the sale of yacht Quest I. Opinion The principal issue is whether the petitioner was in receipt of a taxable dividend in the taxable year 1952 in the amount of $10,806.35 as a result of the purchase, with that amount of corporate funds, of the yacht Quest II. [1]
*136 The respondent determined that the expenditures made by the corporation for the purchase of the boat and for its operation, as well as for insurance premiums, constituted the payment of taxable dividends to the individual petitioner on the theory that such expenditures were made entirely in furtherance of his personal hobby of sailing, and to no extent for a corporate business purpose; and also disallowed the corporation deductions claimed on account of the expenditures for operation and insurance and for depreciation. He maintains that it is immaterial whether the boat was owned by the corporation or by the petitioner, since he claims all expenditures were entirely for the personal benefit of the individual petitioner, citing American Properties, Inc., 28 T.C. 1100, affd. (C.A. 9), 262 F. 2d 150. However, in support of his contention that the purchase of the yacht resulted in the payment of a taxable dividend to the petitioner, the respondent also contends that the petitioner, and not the corporation, was the owner of the yacht Quest II. The burden is upon the *137 petitioners to show error in the respondent's determination. In support of their contention that the purchase of the boat did not constitute the payment of a dividend, they argue that ownership of the boat was in the corporation, and cite Louis Greenspon, 23 T.C. 138, affd. on other issues, 229 F. 2d 947, in which we held that where a corporation purchased and owned assets, the purchase did not result in the payment of a dividend to the principal stockholder, even though the assets were used on such stockholder's farm. In the Greenspon case it was not disputed that the corporation retained ownership of the assets in question. As stated, however, here the respondent does not contend that the individual petitioner was the owner of the yacht. The payments for the purchase price of the yacht Quest II were paid by checks of the corporation, and the yacht broker or dealer issued a receipt in the name of the corporation. There was not introduced in evidence any bill of sale to show in whose name title was taken. However, at petitioner's request the Coast Guard issued to him a certificate of award of number showing him as the owner. In this connection attention *138 is called to section 288, 46 U.S.C.A., which provides that undocumented vessels of this nature shall be numbered by the Coast Guard on application of the owner, and that notice of any change in ownership must be furnished to the Coast Guard, under penalties provided. The regulations under section 288 provide for the furnishing of proof of ownership to obtain a certificate. 46 CFR 2.30-1. The certificate which was issued by the Coast Guard covering the Quest II included a form of bill of sale, which the person named in the certificate as owner was required to execute and deliver to any purchaser in the event of sale. We think the conclusion is inescapable that the petitioner represented himself as the owner and furnished proof of legal title to the Coast Guard. Furthermore, in the insurance policy covering the boat, the petitioner was named as the insured. It is true that the policy provided that any loss was to be paid to the corporation as beneficiary, but we think it may be assumed that the petitioner as the insured had a right at any time to change the beneficiary. Under the circumstances, we think it may reasonably be concluded that the petitioner took *139 title to the boat in his own name. Indeed, it seems that he admits that he had legal title, although he contends he did not have beneficial ownership. The petitioner contends that the "registry" of the yacht with the Coast Guard in his name does not indicate ownership in him, and in effect argues that the boat was registered in his name as president of the corporation, citing 46 U.S.C.A., section 15, which provides that "Registers for vessels owned by any incorporated company may be issued in the name of the president or secretary of such company * * *." Obviously the boat was not registered under section 15. It has no application to the award by the Coast Guard of numbers to owners of undocumented vessels. It is a part of the provisions relating to the registry and recording of vessels with the Bureau of Customs, pursuant to which procedure a certificate of such registry is issued. The petitioners contend, nevertheless, that "registry" does not prove actual ownership and that they are not precluded from showing that actual ownership was in the corporation. They cite, among other cases, Southern Bell Telephone & Telegraph Co. v. Burke (C.A. 5), 62 F. 2d 1015, *140 in which it is stated that registry is not the sole or exclusive evidence of ownership of a vessel. They argue that the purchase of the boat with corporate funds gave rise to a resulting trust in favor of the corporation, citing, among other cases, Muller v. Schramm, 100 N. Y. Eq. 143, 134 Atl. 657. Whether there was a resulting trust in favor of the corporation depends upon the facts and circumstances, including the intent of the parties. As stated in Perry on Trusts and Trustees, volume I, section 139, "As the resulting trust is a mere matter of equitable presumption, it may be rebutted by facts that negative the presumption, and whatever facts appear tending to prove that it was intended that the nominal purchaser should take the beneficial interest as well as the legal title, negatives the presumption." Based upon a consideration of the record as a whole, we cannot conclude that the respondent erred in holding that the purchase of the yacht Quest II, with corporate funds, resulted in the payment of a dividend to the petitioner. The evidence shows that the petitioner had been personally interested in sailing since his school days and that he had, for a number of *141 years prior to 1952, owned another yacht, Quest I, which he used both for his personal pleasure and in furtherance of the business of the corporation. When the Quest II was purchased the petitioner sold the Quest I and took title to the Quest II. He used it, as he had the Quest I, for personal entertaining and pleasure, and paid the corporation nothing for such use. In 1952 he and his family used it for vacation and also for personal entertaining, and, commencing in 1953, he used it for racing, which we consider primarily a personal use, although the petitioner testified that he took business friends on board during the races. Neither of the other two stockholders, and none of the corporation, had the use of the yacht. It is true that the petitioner also devoted the yacht in 1952 to entertainment for the benefit of the corporation, as had been his custom with respect to the Quest I. We see no essential difference in the way he used the Quest II and the way he had used the Quest I, except that in 1952 he used the Quest II to a somewhat greater extent for the benefit of the corporation. As the owner of all but a negligible amount of the stock, he was in a position to use the boat as *142 he pleased and to devote as much or as little of its use to the business of the corporation as he saw fit. While the petitioner testified that he did not intend to purchase the boat for himself and that in making application to the Coast Guard he did not intend to assert that he, rather than the corporation, owned the boat, the fact remains that he did take title and that he represented himself as the owner. No satisfactory explanation was given by him as to why, if the boat was purchased for the corporation, title was taken in his name, rather than in the name of the corporation, and there is no evidence of any intent to later transfer title to the corporation. There was some testimony that visitors on board the prior boat, Quest I, had been much interested in the registry of ships, and it is argued on brief that the business purpose of the corporation could better be served by concealing the fact that the corporation owned the yacht, Quest II. We fail to see the logic of this reasoning. If anything, the fact that the boat was registered in the petitioner's name would indicate that the petitioner held himself out generally as the owner of the boat. It is well settled, particularly *143 in the case of a closely held corporation, that a taxable dividend may be paid to the principal stockholder without the formality of the declaration of a dividend, and irrespective of whether all stockholders participate ( Irving Sachs, 32 T.C. 815, affd. (C.A. 8), 277 F. 2d 879, certiorari denied 364 U.S. 833, and cases cited therein); that the manner of treatment of a transaction on the books of a corporation, although some evidence of the nature of such transaction, is not determinative ( Doyle v. Mitchell Bros. Co., 247 U.S. 179; Regensburg v. Commissioner (C.A. 2), 144 F. 2d 41, certiorari denied 323 U.S. 783, affirming a Memorandum Opinion of this Court; North Jersey Title Ins. Co. (C.A. 3), 79 F. 2d 492; and Eli D. Goodstein, 30 T.C. 1178, affd. (C.A. 1), 267 F. 2d 127); and that a payment by a corporation to or on behalf of a stockholder may constitute a dividend irrespective of the manner in which the transaction is handled on the books of the corporation ( *144 William C. Baird, 25 T.C. 387). As stated in Hash v. Commissioner (C.A. 4), 273 F.2d 248, affirming a Memorandum Opinion of this Court: If a stockholder derives economic benefit it is immaterial in what manner the distribution takes place. Lincoln Nat. Bank v. Burnet, D.C. Cir., 63 F. 2d 131. This is true whether or not a dividend is intended by the directors, Waldheim v. Commissioner, 7 Cir., 244 F. 2d 1, Hadley v. Commissioner, D.C. Cir., 36 F.2d 543 * * *. Considering that the individual petitioner herein had legal title to the yacht, that to a substantial degree he used it as his own, and that he was practically the sole stockholder of the corporation, we think that, viewing the situation realistically, he was free to use or dispose of the boat as he pleased, without any further action by the corporation. We cannot conclude that petitioner has shown that there was an intent on his part or on the part of the corporation that the legal title to the boat should be held by him on behalf of the corporation. We do not think it of any significance that the petitioner, prior to purchasing the boat, obtained the *145 acquiescence of the other two directors. Their stockholdings were negligible and their acquiescence in any action desired by the petitioner might be expected in view of the fact that one was an employee of the corporation and the other its accountant. The fact that the loan agreement between the corporation and the Empire Trust Company provided that the corporation might not, without the consent of the bank, pay or declare any dividends so long as the loan was outstanding, is not, in our opinion, determinative of whether in fact a dividend was paid. In reaching our conclusion, we have not overlooked the possibility that some attempt might sometime be made by creditors to subject the boat to their claims so long as the corporate books reflected it as a corporate asset. However, an examination of the balance sheet of the corporation would seem to indicate that any such possibility would be extremely remote, since the listed value of the corporation's assets, including a large amount of cash, was $250,000 in excess of its liabilities, and the ratio of its assets to its liabilities was in excess of two to one. In view of the foregoing, we sustain the respondent's determination that *146 upon the purchase of the Quest II the individual petitioner received a taxable dividend. Such dividend was, however, in the amount of $10,806.35, rather than $10,870 as determined by the respondent. The petitioners have not shown that the corporation did not have accumulated earnings and profits available for the distribution of such a taxable dividend. Indeed, the balance sheet would seem to indicate that it had accumulated earnings and profits far in excess of any taxable dividends determined by the respondent. During the year 1952 the corporation expended $622.07 in connection with the operation of the Quest II and paid an insurance premium covering the boat in the amount of $354.50. The respondent determined that no part of the expenditures constituted business expenses of the corporation. In this he was clearly in error. The evidence shows that the individual petitioner did entertain various persons on board the yacht for the purpose of benefiting the corporation. These persons included representatives of firms which were customers or prospective customers of the corporation, persons who had business or financial information which the petitioner desired to obtain for the benefit *147 of the corporation, and a representative of the bank from which the corporation had borrowed money. The precise proportion of the use of the boat for business purposes of the corporation has not been shown. The petitioner kept a log on the boat, but it was incomplete and does not show all the entertaining done on board for either personal or business purposes. He also kept a diary in which he listed all persons entertained on board and elsewhere for business purposes. Such diary, however, does not purport to show the extent of the personal use of the boat. The petitioner's own testimony is not precise as to the actual extent of the personal use. He stated that he used the yacht on 24 days for business purposes and that he and his wife took a vacation for 7 days during 1952 on board the yacht and that he used it for personal purposes on at least two other week ends. We have carefully examined all the evidence upon this subject and, exercising our best judgment, have concluded and found as a fact that in 1952 the yacht was used to the extent of 40 percent for the petitioner's personal purposes and 60 percent for the purpose of furthering the business of the corporation. See Cohan v. Commissioner (C.A. 2), 39 F. 2d 540. *148 Accordingly, we hold that to the extent of 60 percent of the amounts expended by the corporation for operation of the boat and for insurance thereon, it is entitled to deductions as ordinary and necessary business expenses. To the extent of 40 percent of such expenditures, the individual petitioner was in receipt of taxable dividends. On brief the respondent has conceded that he was in error in determining that an amount of $191 paid as an insurance premium on the boat Quest I constituted a dividend to the petitioner, it appearing that this amount was expended by the individual petitioner, rather than the corporation. In view of our holding that the yacht Quest II was owned by the individual petitioner rather than the corporation, it follows that the respondent did not err in disallowing the deduction claimed by the corporation in the amount of $634.08, representing depreciation thereon. The individual petitioner has made no claim for the allowance of a deduction for depreciation; in any event, he would not be entitled to a depreciation deduction since the business use of the yacht related to the business of the corporation rather than to any business of the petitioner as an individual. *149 Also, in view of our holding that the corporation did not own the Quest II, it follows that the corporation is not entitled to a casualty loss of $1,107.73 resulting from the operation of the boat. However, the respondent has conceded that such amount is deductible by the individual petitioners as a casualty loss. Decisions will be entered under Rule 50. Footnotes
1. Section 115 of the Internal Revenue Code of 1939↩ provides in part when used in this chapter (except in section 201(c)(5), section 204(d)(11) and section 207(a)(2) and (b)(3) (where the reference is to dividends of insurance companies paid to policy holders)) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *